IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JEAN-DANIEL PERKINS,

     Defendant.

CRIMINAL CASE NO.
1:10-CR-97-JEC-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Pending before this Court is Defendant Jean-Daniel Perkins' Motion to Suppress Evidence, Motion to Suppress Statements, Motion to Suppress Eyewitness Identification, and Supplement to Motion to Suppress Evidence. Docket Entries [19, 20, 21, 51]. This Court convened a suppression hearing with respect to the above-listed motions on December 8, 2010 (Docket Entry 83), after which Defendant submitted a post-hearing brief in support of his motions to suppress evidence and statements. Docket Entry [92]. The Government has filed a response in opposition to Defendant's motions. Docket Entry [109].

Having considered the Defendant's motions and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Eyewitness Identification be **DENIED**.  Docket Entry [21].  Defendant's remaining motions should be **DENIED AS MOOT**.  Docket Entries [19, 20, 51].

## DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

On July 14, 2009, the Grand Jury entered a thirty-seven count indictment against Defendant Jean-Daniel Perkins (hereinafter "Defendant"), including two counts of bank fraud conspiracy in violation of 18 U.S.C. § 1349, thirty counts of bank fraud in violation of 18 U.S.C. §§ 1344 and 2, four counts of access device fraud in violation of 18 U.S.C. §§ 2, 1029(a)(1), and 1029(c)(1)(A)(I), and one count of aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), 1028A(c)(4), and 2.

In Defendant's Motion to Suppress Evidence (Docket Entry 19), he argues that the police's searches of a bag left at a Ruby Tuesday Restaurant in Tampa and a computer and cellular phone, which were inside the bag, were unreasonable because the searches were not justified by probable cause, exigent circumstances, or a warrant.  Defendant further argues that subsequent searches of a private residence and photo lineups are tainted by the original illegal search.  Defendant contends that a subsequent search of an

2

apartment pursuant to a warrant was tainted by the original search and was not justified by probable cause or the good faith exception to a deficient warrant.  Because Defendant has not perfected these issues in his post-hearing briefing, his motion should be **DENIED AS MOOT**.  Docket Entry [19]; <u>see also</u> (Transcript of December 8, 2010 Evidentiary Hearing, hereinafter "Tr.," 202 ("With regard to the briefing, to the extent that you have raised issues in any of the motions [to suppress] . . . to the extent that [the issues were] not briefed, then the Court is going to deem [them] moot or otherwise abandoned.")).

In Defendant's Supplement to Motion to Suppress Evidence (Docket Entry 51), Defendant notes that although the search of the bag left in the Ruby Tuesday Restaurant in Tampa was performed pursuant to a search warrant, it was nevertheless still unreasonable because the police did not obtain the search warrant until at least three weeks after they seized the bag.  Because Defendant has not perfected these issues in his post-hearing briefing, his motion should be **DENIED AS MOOT**.  Docket Entry [51].

Additionally, Defendant challenges the forensic imaging of a laptop computer performed weeks after the police obtained the computer and continued after the completion date specified by the warrant.  Defendant further contends that the warrant was not based upon probable cause because the affidavit in support of the warrant relied

3

solely on information provided by a confidential informant, but was silent on the credibility of the confidential informant. Because the Government has stated that it has no intention of using evidence from the imaged laptop, this portion of Defendant's motion should be **DEEMED MOOT**. Docket Entry [51]; <u>See</u> (Tr. 7-8).

Finally, in his Motion to Suppress Statements (Docket Entry 20), Defendant argues that his statements made during questioning by Federal Bureau of Investigation ("FBI") Agents during and after his arrest on February 26, 2010, outside a Ruby Tuesday Restaurant in Buckhead should be suppressed because his statements were not voluntary and FBI agents did not obtain a valid waiver of his rights. Because the Government has indicated that it has no intention of using these statements at trial, this Motion to Suppress should be **DEEMED MOOT**. Docket Entry [20]; <u>See</u> (Tr. 7-8).

The only suppression motion remaining before the Court is Defendant's Motion to Suppress Eyewitness Identification. Docket Entry [21]. Defendant seeks to suppress the eyewitnesses' photograph identifications because the identification procedures were impermissibly suggestive. For the reasons outlined below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Eyewitness Identification be **DENIED**. Docket Entry [21].

4

## I.   **BACKGROUND FACTS CONCERNING THE WITNESS' IDENTIFICATIONS**

### A.   **Identification by Chester Dixon**

In August 2009, Chester Dixon ("Dixon"), an owner of a United Parcel Services ("UPS") store in Atlanta, was interviewed by a detective from the Duluth Police Department concerning Mark Black ("Black"), who leased a mailbox within the store. (Tr. 12).  In February 2010, law enforcement interviewed Dixon a second time about a second gentleman, who Black introduced to Dixon as his partner.  (Tr. 11-12, 15, 19, 32).  Dixon recalled that the second man accompanied Black in his store three or four times between March and May 2008 and describes him as a "black gentleman, mustache" with "unique dental work" or gold teeth.  (Tr. 15-17, 26, 37-38).  Dixon states that the first time he saw the second man was when Black introduced him as his partner and Dixon, who had a direct view of the man's face, shook the man's hand.  (Tr. 17-18). The next time Dixon saw the man, he was again accompanied Black and was in the store between five and ten minutes.  (Tr. 18).  Dixon explains that the men were memorable because he became irritated at them after Black  rented a residential mailbox, converted it to a business mailbox, yet mail kept arriving at the former residential mailbox, the new business mailbox, and a third mailbox.  (Tr. 26).  When Black came into the store, Dixon

5

had to remind him that he still had mail coming to each of the three boxes.  (Tr. 26).

During an interview with law enforcement, a female officer asked Dixon to look at a photo lineup and advise her whether he recognized any of the individuals.  Dixon does not recall giving the detective a physical description of the second man before viewing the photo lineup, but remembers discussing the fact that the second man had gold teeth.  (Tr. 29, 31).  The officer did not tell Dixon which selection to make or suggest which picture should be selected.  (Tr. 21).  The photo lineup had six black and white pictures on a single page, labeled one through six.  (Tr. 20, 32-33; Gov't Ex. 1).  After viewing the pictures for ten to fifteen seconds, Dixon indicated that he did recognize one of the individuals, and the officer instructed him to circle the individual he recognized.  (Tr. 19, 21).  Dixon chose photo number two, circled the photo, and signed his name on it because he believed photo number two was the man who accompanied Black to the store.  (Tr. 19-20; Gov't Ex. 1).  Dixon testified that he made the identification by looking at the man's general facial features, his round face, his race, his mustache, his size, and his clean cut look.  (Tr. 38).  Dixon claims that he was 80% confident in his selection.  (Tr. 34, 38).  Dixon states that because the photos were black and white, he cannot tell from the photos whether the individuals therein have gold teeth. (Tr. 34, 38).

6

**B.**   **Identification by Alana Melissa Stump**

Detective Fran Foster of the Duluth Police Department also interviewed Alana Melissa Stump ("Stump") who is an associate with the Buckhead UPS store.  (Tr. 40). Detective Foster asked Stump about people who picked up mail for box 709 at the store. (Tr. 41).  For Stump, box 709 stood out in her memory because the mail that was sorted for the box occasionally appeared to be stacks of thirty to forty envelops containing credit cards.  (Tr. 42).  Stump testified that for approximately six months a black male with gold teeth, who was "kind of stocky" and of average height came by to pick up the mail once or twice a week.  (Tr. 43-44).  Stump further stated that each time the gentleman came to the store, she saw him for approximately fifteen to twenty seconds at a distance of a couple of feet because he would come to her service counter to obtain his mail.  (Tr. 44-45).

On or around August 18, 2009, Stump received an email from Detective Foster attaching a single picture for her to review and asking whether the picture depicted the man who picked up the mail from box 709.  (Tr. 47-48; Gov't's Ex. 3).  Stump reviewed the email at the store outside of the presence of Detective Foster and subsequently responded that she was "110%" sure that the photo depicted the man who had been coming to the store to pick up the mail.  (Tr. 48-50; Gov't's Ex. 4).

7

On or around February 11, 2010, Detective Foster came to the store and showed Stump a copy of the six picture photo identification lineup. (Tr. 51-53). Stump believes the photo lineup consisted of black and white photos. (Tr. 60). Detective Foster asked Stump if she recognized anyone from the pictures, but did not say anything that would suggest or otherwise prompt Stump to make a selection. (Tr. 53-54). Stump is not sure whether Detective Foster asked her to describe the man who had been picking up mail prior to August 18, 2009, but maintains that she told Detective Foster that he was a "black male, stocky, [with] . . . the gold teeth" and "not too tall, not too short." (Tr. 57).

Stump testified that she immediately recognized the man depicted in photo number two as being the man who picked up mail for box 709. (Tr. 51-52, 54-55). Stump testified that she was "100% sure" in her selection, she "knew his face from seeing him so often" and that the "gold teeth stuck out the most for [her]." (Tr. 52, 54). Stump additionally agreed that the photo was consistent with the age, build, and facial structure of the person who picked up the mail from box 709. (Tr. 55). Stump further testified, "Like I said, I've just seen him so many times there's no other way to say it. I mean, I don't recognize anybody else, but him for sure." (Tr. 52). Stump did not believe that the other men depicted in the photo lineup had gold teeth. (Tr. 61-62).

8

C.      **Identification by William Tony Parris**

FBI agents interviewed Tony Parris ("Parris"), a sales associate at the Lenox Mall Wolf Camera, in connection with two customers' purchase of camera equipment on March 2, 2010. (Tr. 64-65, 69). Parris recalls that two African-American men came into Wolf Camera on February 24, 2010, and he interacted with them for approximately ten to fifteen minutes at a distance of no more than five or six feet away while they examined and discussed a camera lens. (Tr. 65-66, 68, 73-74). The next day, the two men returned to the store, and Parris recalls interacting again with them for twenty to thirty minutes at a distance of five feet away and sometimes ten to fifteen feet away, while they examined equipment and made a purchase of several items, including some memory cards. (Tr. 67, 74-75). Parris states that the transaction was unusual in the sense that most people do not purchase damage protection for memory cards. (Tr. 67). Parris testified that he got a good look at the individuals. (Tr. 76).

Parris states that he told the FBI the taller of the two had a gold grill in his mouth or gold teeth. (Tr. 70, 86). According to Parris, the taller of the two was also a little overweight. (Tr. 70). The FBI asked Parris to examine a six-man photo array to see if he recognized any of the individuals from within. (Tr. 71; Gov't Ex. 6). The agents did not tell Parris which selection to make or suggest a particular selection. (Tr. 78).

9

Each picture within the array was identified by a number, and within ten or fifteen seconds, Parris selected the picture labeled number two as being the person who purchased camera equipment from him, signed it, and dated it March 2, 2010.  (Tr. 72, 77, 79).  Parris testified that he could not discern whether the other men within the photo lineup had grills on their teeth.  (Tr. 88).  Within a couple minutes later, the FBI asked Parris to look at a second photograph of one person.  (Tr. 79-80, 89; Gov't's Ex. 7).  Parris was asked if he recognized the individual.  (Tr. 80).  Parris identified the man in the photograph as the one with the gold teeth who had been in the store, and then initialed the picture.  (Tr. 79-80, 89; Gov't's Ex. 7).  The agents did not tell Parris to make the selection on the page or suggest that the man was one of the individuals that had come to the store.  (Tr. 80).  Parris testified that he was very confident that the man was the one who had come to his store and relied on his facial features and grill in his mouth to identify him.  (Tr. 81-82).

### D.    Identification by Matthew Delellis

Matthew Delellis ("Delellis"), an Assistant Manager with the Ruby Tuesday in Tampa, worked as the closing manager for the restaurant on October 23, 2009.  (Tr. 104).  At the beginning of his shift, Dellis noticed an African-American male, a female, and three children viewing a movie on a laptop on a table.  (Tr. 105-06).  After they left, their

10

server notified him that someone had left a laptop shoulder bag on the floor under their table. (Tr. 107-07). Delellis took the bag into his office, opened it, and looked for identification so he could return the bag to its owner. (Tr. 108). Delellis was unable to find identification within the bag, instead finding a stack of at least twenty credit cards. (Tr. 109-10). Delellis looked at the credit cards, hoping for a name, but instead observed that the cards all had different names on them. (Tr. 109). Delellis also observed unopened envelopes that appeared to be from the same company as the credit cards. (Tr. 110). Delellis also found a laptop computer within the bag. (Tr. 110). Delellis reported the matter to his managers and was directed to call the police. (Tr. 110). One officer arrived at the restaurant, discussed the matter with the server who had waited on the table where the bag was left and the General Manager, and left with the bag. (Tr. 111-12).

At approximately 7:00 or 8:00 p.m., the General Manager answered a phone call in which someone was asking about the bag. (Tr. at 112-13). The General Manager advised the caller that they did not have his bag. (Tr. 112-13). At 9:00 or 10:00 p.m., a man and a woman arrived at the restaurant and went to the table to look for the bag. (Tr. 113-14). The man also asked the General Manager and Delellis about the bag. (Tr. 113). The General Manager and Delellis advised the man that they believed the bag contained "suspicious items," they had notified the Sheriff, and if he wanted his bag, he

would need to go to the Sheriff's office to pick it up.  (Tr. 114).  The man, who appeared unhappy, left fairly quickly. (Tr. 114).

The whole encounter lasted no more than approximately five minutes.  (Tr. 116). The brief conversation between Delellis and the man occurred at a distance of about four or five feet, and Delellis was able to get a good look at his face.  (Tr. 115).  Delellis recalls that the man was African-American, had gold teeth, stocky, and was a "little shorter" than Delellis, who is six feet and one inch tall.  (Tr. 115-16).

Nearly three weeks later, a postal inspector came to the restaurant and presented a six picture color photo lineup to Delellis and asked him if he recognized anyone on the page.  (Tr. 117, 120; Gov't's Ex. 11).  Delellis quickly recognized the man who had returned to the restaurant to ask for his bag, circled his picture (Picture No. 2), and initialed it. (Tr. 118).  Delellis was 98% confident in his selection and agrees that no one did anything to prompt him to make a particular selection.  (Tr. 120).  While Delellis agrees that no man within the other photos has gold teeth, he also observes that two of the other men had their mouths closed and that it is difficult to tell whether the gentleman depicted in photo number five has gold teeth.  (Tr. 126-27).  Delellis testified that because he had participated in a conversation with the man two weeks prior to identifying him, it was pretty fresh in his mind which picture was the man.  (Tr. 128).

AO 72A
(Rev.8/82)

## II.   **LEGAL ANALYSIS**

Defendant moves to suppress the photo identifications made by Dixon, Stump, Parris, and Delellis on the grounds that the photo lineups were overly suggestive because they contained only one picture of a man with gold teeth and the witnesses acknowledged that the gold teeth was the prominent feature of the man they identified. In addition, Defendant argues that the identifications by Stump were especially suggestive because initially, Stump was only shown one picture.

In Foster v. California, 394 U.S. 440 (1969), the Supreme Court recognized that, under a totality of the circumstances standard, the conduct of identification procedures may be "so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law."   Id. at 442 (internal quotation marks omitted); see also Simmons v. United States, 390 U.S. 377, 384 (1968) (holding that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").   The linchpin in determining the admissibility of identification evidence is reliability.   Manson v. Brathwaite, 432 U.S. 98, 114 (1977).   "It is the

13

likelihood of misidentification which violates a defendant's right to due process." <u>Neil</u> <u>v. Biggers</u>, 409 U.S. 188, 198 (1973).  In the Eleventh Circuit, a two step analysis is used to determine whether the admission of an out-of-court identification violates due process. <u>United States v. Diaz</u>, 248 F.3d 1065, 1102 (11th Cir. 2001) (citing <u>Cikora v. Dugger</u>, 840 F.2d 893, 895 (11th Cir. 1988)).  First, a court must determine if the original identification procedures were unduly suggestive.  <u>Id.</u>  If the procedures were unduly suggestive, then a court must consider whether, under the totality of circumstances, the identification was nonetheless reliable.  <u>Id.</u>

### A.   <u>Suggestiveness</u>

Defendant argues that the lineup was unduly suggestive because it contained only one picture of a man with gold teeth and the witnesses acknowledged that the gold teeth was the prominent feature of the man they identified.  In addition, Defendant argues that the identifications by Stump were especially suggestive because initially, Stump was only shown one picture.  Defendant further argues that the procedures used by law enforcement officers were suggestive because the law enforcement officers did not tell the witnesses standard admonitions such as that the man to be identified may or may not be within the photo lineup or that appearances sometimes change overtime.

Factors considered in determining whether a photo array is unduly suggestive

14

include the size of the array, the manner of its presentation, and details of the photographs themselves. United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994); United States v. Rosa, 11 F.3d 315, 330 (2d Cir. 1993). If there is nothing inherently prejudicial about the presentation, such as the use of a very small number of photographs or the use of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit." Rosa, 11 F.3d at 330.

In this case, the size of the array for each of the six-picture lineups militates in favor of a finding that the photo array was not unduly suggestive. See, e.g., Sanchez, 24 F.3d at 1263 (six photograph array not unconstitutionally small); Rosa, 11 F.3d at 330 (six photographs not impermissibly small). Additionally, the manner of the presentation of the six person photo lineups to Dixon, Parris, and Delellis were not unduly suggestive. There was nothing suggestive about the manner in which the photo array was presented. Dixon, Parris, and Delellis testified that the law enforcement officer did not suggest or indicate which picture should be selected. (Tr. 21, 78, 120). Dixon, Parris and Delellis further testified that the law enforcement officer simply asked them whether they recognized anyone in the picture. (Tr. 19, 21, 71, 117, 120, 127); see United States v.

15

Knight, 382 F. App'x 905, 907 (11th Cir. 2010) (concluding that procedure was not unduly suggestive where law enforcement simply asked the witness to identify any individual he recognized from the array and to explain in what event in his life that person was associated).  The mere fact that there is no evidence that the witnesses were given formal admonitions prior to viewing the photo array or that they were not told that the Defendant may or may not be within the photo array is not enough to cause the lineup to be suggestive.  United States v. Chance, 277 F. App'x 941, 945 (11th Cir. 2008); Smith, 148 F. App'x at 874-75 (finding that where no evidence existed that officer influenced the process with nonverbal cues, gestures or signals, the process was not suggestive merely because the officer conducting the lineup knew which photo array contained the suspect and could *potentially* influence the process); Cikora, 840 F.2d at 896-97 (concluding that lineup was not unduly suggestive even though law enforcement officer told witness that one of the individuals pictured was the suspect).      Moreover, the selection of the photos to be included within the lineup was not unduly suggestive. Each of the men depicted in the photographs were oriented with their face forward in the center of the picture, shown from the neck upwards, and the amount of contrast within the photos was random.  The presentation of the photographs showing the teeth of the man in picture number two of the photo line up did not make the line up unduly

16

suggestive.   A lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others.  Smith, 148 F. App'x at 874-75, citing Cikora, 840 F.2d at 895-96.  There is also no requirement that the other persons within the photographs look nearly identical to the defendant to pass constitutional muster. Cikora, 840 F.2d at 896-98; McGowan v. Miller, 109 F.3d 1168, 1174 (7th Cir. 1997) (noting that the police are not required in developing a photographic lineup to conduct a search for identical twins in age, height, weight, or facial features); see also United States v. Walker, 199 F. App'x 884, 887 (11th Cir. 2006) (photo lineup which depicted six similar looking African-American males who were similar in complexion and had short hair was not impermissibly suggestive despite some differences between the photos).  In this case, the men depicted in the photographs had the same gender, appeared to be African-American, appeared to be roughly the same age, had similar hair length, skin tone, and, for the most part, similar facial shape and fullness of the face.  See, generally, Exs. 1, 2, 6, 11; Knight, 382 F. App'x at 907 (finding that photo lineup which depicted six African-American males of similar age and build was not unduly suggestive even though the defendant was of lighter complexion and the background lighting was slightly different); see also United States v. Bautista, 23 F.3d 726, 731 (2d Cir. 1994). Furthermore, it is not apparent from the photographs that only one of the six men had

17

gold teeth.  Dixon testified that he could not tell whether any of the other men depicted in the photo array had gold teeth.  (Tr. 33).  Additionally, Parris testified that he could not tell whether the other men had a grill.  (Tr. 88-89).  Similarly, Delellis testified that in two of the pictures, the mouths looked shut, and he could not tell whether the gentlemen in picture number five had gold teeth.  (Tr. 126-27).  Thus, even if the witnesses may have discerned from photograph number two that the man depicted had something on his teeth, the line up was not unduly suggestive because the witnesses, for the most part, could not rule out whether the others depicted within the photographs had gold teeth as well. See, e.g., Sanchez, 24 F.3d at 1261 (finding that six-person lineup in which the defendant was the only person with his eyes closed was not unduly suggestive); United States v. Ricks, 817 F.2d 692, 697 (11th Cir. 1987) (finding with some reservations that photo array in which defendant was the only person wearing eyeglasses was not unduly suggestive); Jones v. Smith, 772 F.2d 668, 671-72 (11th Cir. 1985) (concluding that where eye witness had previously described defendant as short, lineup was not impermissibly suggestive even though defendant was shortest person in the lineup); United States v. Moulton, No.1:10-CR-00120-MHS, 2010 WL 6084115, at *14 n.22 (N.D. Ga. Nov. 22, 2010) (concluding that the fact that the defendant was the only individual within the photo array with a visible tatoo on his neck did not render the

lineup unduly suggestive).

In contrast, however, the single photographs shown to Stump and Parris may have been unduly suggestive. United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984) (single photo display suggestive); Tracy v. McDonough, No. 3:05cv152/RV/MD, 2006 WL 1174359, at * (N.D. Fla. Mar. 29, 2006) (concluding that witness' inadvertent identification of single photo of defendant was unnecessarily suggestive but nevertheless admissible because the identification was reliable).

### B.   Reliability

Even a single-picture photo display, however, can be admissible if the identification is otherwise reliable. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification. United States v. Walls, 237 F. App'x 599, 601 (11th Cir. 2007), citing Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987). Factors to be considered in determining reliability of an identification include: "the opportunity of the witness to view the [defendant] at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the [defendant], the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200;

Diaz, 248 F.3d at 1102.  In this case, there was not a substantial likelihood that any of the identifications were unreliable.

### 1.    Stump's Identification

Although Detective Foster initially only emailed Stump one picture and asked her whether the man depicted in the photo was the man who had come to the UPS store to pick up the mail from box 709, Stump's identification was nevertheless reliable.  Stump interacted with the gentleman she believed she was identifying once or twice a week for six months from a distance of two feet away because he would have to walk up to her service counter to let her know he needed his mail.  (Tr. 42-45).  Each time, Stump had a direct view of his face.  (Tr. 45).  Additionally, Stump described her degree of certainty as to whether the person depicted in the picture was the person who came to pick up the mail from box 709 as 110%.  (Tr. 50).  Similarly, Stump's identification of the man from the six picture photo lineup was also reliable.  Stump testified that she selected picture number two from the six-picture photo lineup within ten seconds.  (Tr. 52-54).  Stump further testified that she was 100% confident in her selection because she had "just seen him so many times" that when viewing the photos, she  did not "recognize anybody else, but him for sure."  (Tr. 52, 54). While little evidence was presented tending to show the Stump's prior description of the man and the length of time between her physical

20

observations of the man and the time she viewed the photographs, given that Stump interacted with the man on a weekly basis at close distance for approximately six months, and that Stump was so confident in her recognition of him, this Court concludes that both of Stump's photo identifications were reliable.

### 2. Parris' Identifications

Similarly, Parris' identifications of the man from the single photograph as well as the six-person photo lineup were also reliable.  The identifications were made approximately six days after the man had been to the store where Parris worked. Additionally, the quality of the interactions between Parris and the man militate in favor of a finding that the identification was reliable.  Parris "got a good look at his face" when he discussed camera equipment with him two days in a row, the first time for ten to fifteen minutes at a distance no more than six feet away.  (Tr. 65-66, 68, 73-74, 76).  The second interaction was even longer, for twenty to thirty minutes at a distance varying between five to fifteen feet.  (Tr. 74-75).  Additionally, Parris testified that his confidence level that the man in the single photo (Exhibit 7) was the man who had come to his store was "very high."  (Tr. 81).  Similarly, Parris was able to identify the man depicted within picture number two of the six-photo lineup as the man who had come to his store in no more than fifteen seconds.  (Tr. 72, 77, 79).

AO 72A
(Rev.8/82)

3.    Dixon's Identifications

The identification by Dixon was also reliable.  Although there was more than a year and a half between the time that Dixon interacted with the man and the time he made the identification, Dixon viewed the man three or four times during a three month period and on the first occasion, he directly viewed the man's face while shaking his hand.  (Tr. 15-18, 26, 32, 35, 37-38).  Dixon also recalls that the man and his partner were memorable because he had to repeatedly remind them that they had mail arriving at three different mailboxes within the store even though they were only renting one mailbox, and indeed, he selected the man from the six person lineup within ten to fifteen seconds.  (Tr. 19, 21, 26, 34, 38).  Additionally, Dixon affirms that he was 80% confident in his selection.  (Tr. 19, 21, 26, 34, 38).  Additionally, Dixon was not even certain that the man depicted in the second photo had gold teeth when making his selection and made his selection based on the facial features of the individual, such as his "round face, mustache, and clean cut" look.  (Tr. 30, 38-39).

4.    Delellis' Identification

Delellis also had a good opportunity to view the man under memorable circumstances.  (Tr. 129).  The man had come to retrieve a bag that the restaurant's staff had given to the police because of the presence of numerous credit cards within the bag,

22

all assigned to different names, was suspicious. (Tr. 109-12, 114). Delellis, who conversed with the man, was able to get a good look at the man's face, at a distance of four or five feet, while they discussed the bag for less than five minutes. (Tr. 115-16). Delellis identified the man less than three weeks later while his memory of the man "was pretty fresh in his mind." (Tr. 128). Additionally, Delellis indicated that he was 98% confident of his identification. (Tr. 120).

### C. **An Additional Hearing is not Warranted**

Finally, Defendant argues that because magistrates issuing the warrants authorizing searches of Defendant's residence, bag, and laptop computers were not notified of the suggestive nature of identifications within the affidavits in support of search warrants, this Court should order a new hearing on whether probable cause would exist if the suggestive nature of the identifications had been relayed to the issuing magistrates. In this case, no such hearing is warranted. First, as discussed above, this Court concludes that the procedures used in the majority of the identifications were not suggestive. Additionally, as discussed above, even assuming arguendo that procedures used were suggestive, the identifications were still reliable.

### **CONCLUSION**

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's

AO 72A
(Rev.8/82)

Motion to Suppress Eyewitness Identification be **DENIED**.   Docket Entry [21].

Defendant's remaining motions should be **DENIED AS MOOT**.  Docket Entries [19,

20, 51].  There are no further motions or problems pending before the undersigned to

prevent the scheduling of this case for trial.  Therefore, this action is **CERTIFIED**

**READY FOR TRIAL**.

  **SO ORDERED, REPORTED AND RECOMMENDED** this <u>21st</u> day of April,

2011.


     <u>s/Linda T. Walker      </u>
     LINDA T. WALKER
     UNITED STATES MAGISTRATE JUDGE

24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JEAN-DANIEL PERKINS,

    Defendant.

CRIMINAL CASE NO.
1:10-CR-97-JEC-LTW

## **ORDER FOR SERVICE OF REPORT AND RECOMMENDATION**

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 72.1C.  Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b) (1), within fourteen (14) days after service of this order, each party may file written objections, if any, to the Report and Recommendation. Pursuant to Title 18, United States Code, Section 3161(h) (1) (F), **the above-referenced fourteen (14) days allowed for objections is EXCLUDED from the computation of time under the Speedy Trial Act.**

Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court.  If no objections are filed, the report and recommendation may be adopted as the opinion and order of the District Court.  **Failure to object to this Report and Recommendation waives a party's right appellate review**.  Fed. R. Crim. P. 59(b)(2).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this <u>21st</u> day of April, 2011.


s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE