IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


UNITED STATES OF AMERICA,

                                CRIMINAL CASE NO.

v.

                                1:10-cr-97-1-JEC-LTW

JEAN-DANIEL PERKINS,
    a/k/a Daniel Mathews,
    a/k/a LJ.


       Defendant.

## SUBSTITUTED ORDER & OPINION[1]

This case is before the Court, following its provisional sentencing of the defendant on February 27, 2013, for written rulings on pending motions.

As the defendant refused to be brought from his cell in the lock-up area of the courthouse to the courtroom on the above day of sentencing, the Court indicated that it would give the defendant until March 25 to provide the Court with any remarks that he might wish to make concerning his sentencing. The Court further allowed the Government until March 25 to provide the transcripts of jail calls made by the defendant, which calls were referenced in the Presentence Report and which calls are pertinent in resolving defendant's Motion for New Trial [190].

---

[1] This Order is intended as a substitute for the Order of July 17, 2013 [312], which is hereby vacated.

Defendant has never responded to the Court's offer. Accordingly, the provisional sentence will become the final sentence. As to the transcripts that were necessary for the Court to finalize its written order denying the defendant's Motion for New Trial [190], the Government obtained an extension and filed these transcripts on April 5, 2013. The Court now formally denies defendant's motion for a new trial,[2] as well as his other pending motions.

**BACKGROUND**

## I.   CHARGES AGAINST DEFENDANT

A grand jury indicted defendant for credit card fraud, bank fraud, and identity theft. (Compl. [1].) The evidence presented at trial indicated that defendant had engaged in a very sophisticated, organized, and lucrative fraud scheme that can be grouped into three categories.

First, the defendant bought stolen credit cards and used these cards to purchase goods from unsuspecting retailers. (Trial Tr. [237] at 97-98.) Second, the defendant established dozens of bank accounts for fake merchants and made charges to these merchants using stolen American Express cards, which charges totaled millions of dollars. (Trial Tr. [237] at 103-05; Pre-Trial Conference Tr.

---

[2] The Court had earlier indicated, when it set the defendant's case down for a sentencing hearing, that it was going to deny the defendant's motion for a new trial, and that it would issue a written order at the time of sentencing. (See Aug. 28, 2012 Order [264].) This Order constitutes the Court's written reasons for denial of the motion.

AO 72A
(Rev.8/82)

(hereinafter, "PT Conf. Tr.") [253] at 7.)  Third, defendant posed as a signatory for three different companies that had large-balance corporate accounts with the SunTrust Bank.  Impersonating these signatories, defendant called SunTrust and convinced it to give him electronic access to the particular corporate account.  After he gained electronic access, defendant then transferred large sums of money out of the corporate accounts into accounts controlled by him. (Trial Tr. [237] at 101-02.)  In addition to these schemes, defendant was also charged with, and convicted of, identity theft.  (Trial Tr. [237] at 99.)

## II.  **"SOVEREIGN CITIZENSHIP" LITIGATION STRATEGY**

In the Northern District of Georgia[3] and elsewhere, a new litigation strategy has become popular with some criminal defendants housed in detention centers awaiting trial.  This strategy, based on the defendant's claim to be a "sovereign citizen," serves to delay the proceedings, create unnecessary work for the Court and counsel, and distract the Court from adjudication of the case on its merits. At bottom, a defendant pursuing a sovereign-citizen strategy claims that a federal court has no jurisdiction to try him for the federal crimes with which he is charged.  The defendant purports to rely heavily on the Uniform Commercial Code ("UCC"), admiralty laws, and other commercial statutes to argue that, because he has made no

---

[3]  *See, e.g., United States v. Cartman,* 1:10-cr-512-JEC-LTW, [248] at 1-12.

contract with the Court or the prosecutor, neither entity can foist any agreement upon him. The criminal code is apparently not one of the groups of statutes whose validity the defendant will acknowledge. Accordingly, the defendant contends that he cannot be found guilty of any violation of federal criminal laws.[4]

The sovereign-citizen defendant typically files lots of rambling, verbose motions and, in court proceedings, will often refuse to respond coherently to even the simplest question posed by the Court. Each question by the judge is volleyed back with a question as to what is the judge's claim and by what authority is the judge even asking a question. When referred to as the defendant or by his name, the defendant will frequently indicate that there is no proof that he is the defendant, but that instead he is a third-party intervenor.

In proceedings, the observant sovereign-citizen defendant clings doggedly to the sovereign-citizen script, which the record in this case reveals to be tedious and mind-numbingly repetitious. Any colloquy with the court is usually characterized by frequent

---

[4] For a discussion of the origins of this "defense," *see* James Erickson Evans, *The "Flesh and Blood" Defense*, 53 WILLIAM & MARY L. REV. 1361 (Mar. 2012). As far as this Court is aware, the defense has never succeeded in any court. *See id.* at 1363 (the defense "is legally frivolous...[and] it is as if the proponent had advanced no argument at all.", and at 1364 (the defense "has no average success rate...[because it] fails every time.")) *See also United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011)(sovereign-immunity defenses are not raised in good faith and the court has "repeatedly rejected ...theories of individual sovereignty, immunity from prosecution, and their ilk.") and cases collected therein.

4

interruptions by the defendant, who attempts to talk over the judge. For the most part, the defendant's statements to the Court are gibberish. On the matter of legal representation, the defendant will often refuse to cooperate with, or even speak to, his appointed counsel and will sometimes protest that he never authorized appointment of counsel. Yet, when the Court attempts to engage the defendant to determine whether the latter wants new counsel or wants to represent himself, the non-responsive dialogue begins, with the defendant refusing to affirmatively indicate his waiver of counsel or to answer in any coherent way as to how he wishes to proceed.

Defendant's behavior in the present case could be characterized as sovereign citizenship on steroids, for, as described below, he took the typical sovereign-citizen persona to a new, dramatic, and provocative level.

## III. <u>PRETRIAL PROCEEDINGS</u>

### A.   <u>Proceedings Before Magistrate Judge</u>

Defendant appeared before the Magistrate Judge at two hearings in the months prior to his trial: a suppression hearing and a hearing to determine whether defendant wished to waive his right to counsel. During these proceedings, defendant repeatedly interrupted the magistrate judge, peppering each with his own questions. For example, at the December 8, 2010 suppression hearing, the magistrate judge noted that defendant was attempting to manipulate the proceedings by asking for a bathroom break each hour and by yelling

out in court.  (Dec. 8, 2010 Hr'g Tr. [83] at 129-32.)  In one of those outbursts, the defendant accused the magistrate judge of trespass and threatened her with a $1.8 million fine if she again used his name, as the defendant contended that the latter was his personal property.  (*Id.* at 132.)

After that hearing, and despite being represented by counsel, defendant filed several nonsensical pleadings that were "incoherent and riddled with gibberish."  (Order of Apr. 25, 2011 [130] at 1-2.)  This Court ultimately struck these pleadings [115, 119, 125, and 128] and directed defendant to file no more motions.[5]  (*Id.* at 2.)

Approximately a month before trial, Perkins' second appointed counsel,[6] filed a motion to withdraw as counsel, indicating that defendant has made it clear that he did not want this person as his counsel or any person as counsel.  (Mot. to Withdraw as Counsel [139].)  The magistrate judge conducted a hearing and specifically asked defendant if he wanted to waive his right to counsel.  (May 25, 2011 Hr'g Tr. [151] at 5-6.)  Even though the magistrate judge permitted the defendant to say whatever he wanted, he would never say

---

[5]  The gist of these pleadings was summarized at a later pretrial conference presided over by the undersigned.  (June 16, 2011 Pretrial Conf. Tr. [253] at 20-24.)

[6]  The first appointed attorney had moved to withdraw based on his inability to work with the defendant, which motion was granted.  ([61, 65].)

that he waived his right to counsel.[7]   Instead, using "sovereign-citizen" jargon, he spent his time asking the magistrate judge questions and making various pronouncements, such as that he had never agreed to be incarcerated on the charges, that he rejected any recess of the hearing, and that the magistrate judge would be charged for having used the defendant's name, as that was his copyrighted property.  (*Id.* at 3, 6-7.)   Concluding that the defendant would never affirm that he waived his right to counsel, the magistrate judge directed that appointed counsel continue to represent him. (*Id.* at 6.)

###   B.   Pretrial Conference Before The Undersigned

Trial had been set for June 20 and the pretrial conference for June 16.  ([130].)  On June 14, defendant's appointed counsel filed a second motion to withdraw as counsel [150].  The Court held its pretrial conference on the scheduled date, with the defendant present.  After summarizing the recent pleadings that the defendant, *pro se*, had filed, the Court turned to the defendant and asked whether he wanted to waive his right to counsel.  (PT Conf. Tr. [253] at 23-24.)  Although the conference proceeded on for 19 more pages of transcript, the defendant never answered that question.

The colloquy began:

**COURT**: Let me turn to you then, Mr. Perkins, are you trying

---

[7]   Defendant's response to that specific question: "How can I waive something that I have never accepted and that does not apply to me?"  (*Id.* at 6.)

7

to indicate that you want to waive your right to counsel?

. . . .

**DEFENDANT**: Going on the record how can I waive something that I never accepted that does not apply to me?

**COURT:** Okay. So the answer to that is no, you can't, you don't waive your right to counsel?

Refusing to answer this direct question, the defendant directed a barrage of questions at the undersigned:

**DEFENDANT:** For and on the record can you provide proof of claim that I've ever accepted or desired representation?...

**COURT:** I don't answer questions, but you can answer them.

**DEFENDANT:** Well, do you have a claim against me?

**COURT:** I don't answer questions.

**DEFENDANT:** May I have your name please?

**COURT:** I don't answer any questions, but you can answer some.  Do you wish to waive...you don't want...

**DEFENDANT:** Can you provide proof of claim of my obligation to have representation?

(*Id.* at 24-25.)   At this point, the Court told defendant that he could state all of his questions at one time, but the Court would be answering none.  (*Id.* at 25.)   The defendant then asked such questions, some of them multiple times, as whether the Court knew the definition of the words "stand trial;" what was the undersigned's name; whether the undersigned was an American citizen; where was the defendant; whether the undersigned was the trustee; whether the Court had a claim against him; whether the prosecutor had a claim against

8

him; whether the Court had a contract with him, and so forth. (*Id.* at 26-29.)

Not receiving any answers from the Court, the defendant began to give orders: "I order you to dismiss these charges against me." (*Id.* at 29.) When the undersigned asked whether the defendant would follow any directions that she might give to him at a trial, the defendant would not answer the question, finally saying, "I don't understand." (PT Conf. Tr. [253] at 29-30.)

The Court tried again to ask if the defendant waived counsel, with the same circular and non-responsive answer from the defendant. The Court then tried another tack to get the defendant to speak without using gibberish, by asking the defendant what his educational background was. This line of inquiry precipitated an existential crisis for the defendant that launched him and the undersigned into a colloquy reminiscent of the Abbott and Costello routine "Who's on first," except not so funny.

> **Court:** And, Mr. Perkins, what's your educational background?
>
> **DEFENDANT:** For and on the record, who are you talking to?
>
> **Court:** I'm talking to you, Mr. Perkins.
>
> **DEFENDANT:** Where's the defendant?
>
> **Court:** I'm not talking to the defendant. I'm talking to you, Mr. Perkins, the security (sic) and the debtor. What's your educational background?
>
> **DEFENDANT:** For and on the record, if I answer that question would I have made contract with this Court?

9

    ....

**COURT:**  If we have a trial...how would you intend to defend yourself against these charges-

**DEFENDANT:** ...What if I don't defend?  What if I'm not a defendant?  Where is your defendant? How can you have a defendant if I'm not here to defend anything?

[The Court continues to try to probe defendant as to his planned defense, and defendant continues to answer, "I do not accept your offer."]

**COURT:**  So you would not defend yourself in any way at a trial?

**DEFENDANT:** Who is myself?  Who do you say that I am?

(*Id.* at 30-32.)

At the end of this unproductive conversation with the defendant, the Court indicated that because the defendant refused to waive his right to counsel, as well as for other reasons made clear during the colloquy, defendant's appointed counsel would continue to represent him at trial.  (*Id.* at 34-39.)  The defendant had shown increasing frustration with the Court's earlier refusal to answer his questions. At the point that the undersigned announced that his appointed counsel would continue to represent him, the defendant became very angry.  As the Court continued to try to discuss the upcoming trial, the defendant began talking over the Court, repeating his usual litany of pronouncements, prominent among which was that he did not accept the Court's offer.  Finally, the undersigned had to direct the court reporter to take down only what the undersigned said, as the defendant would not stop talking over the Court.  Eventually, the

defendant's microphone had to be turned off so that the undersigned could be heard. But in the tape recording of the proceeding, the defendant can still be heard talking. (*Id.* at 38-43.)

After addressing some scheduling matters, the Court recessed the hearing, and called counsel into chambers to discuss how to proceed should the defendant continue his outbursts during trial and have to be removed from the courtroom. (*Id.* at 43-49.) The Court did so in defendant's absence because it had been impossible to speak with defendant in the same room, talking loudly over the undersigned. (*Id.* at 48.)

## IV.   **THE MORNING OF TRIAL**

Trial was set to begin at 9:30 a.m. Just prior to that time, the deputy marshal informed the Court of difficulties that the marshals were having in dealing with the defendant. At 9:35 a.m, the Court conferred with counsel, directing the deputy, Deputy Bateholts, to explain the situation. (Trial Tr. [236] at 2.)

Deputy Bateholts indicated that the defendant, who was in lock-up in the Marshal's detention area of the courthouse, had refused to put on the clothing that the Court had found for him to wear. More importantly, the defendant had stated that he was not going to court. (*Id.* at 2-3.) When asked, defense counsel indicated that this was consistent with what the defendant had told him that morning. (*Id.* at 3.) The deputy further stated that he had told the defendant that the latter might have to come to the courtroom to, at least, let the

11

judge know that he did not want to be present during trial, but that the defendant had replied that he was not going to court. (*Id.* at 3-4.)

At this point, the Court indicated its sense that it would be best if the defendant could be present in the courtroom as jury selection got underway, even if only briefly. The Court discussed with counsel what its options were in this unusual turn of events. (Trial Tr. [236] at 4-5.) Counsel and the Court focused on the logistics of conducting a trial with the defendant in a lock-up that had an audio and video feed. (*Id.* at 6-12.) The Court reiterated that it wanted to have the defendant in the courtroom, albeit briefly, and directed the deputy to tell the defendant that he had to come to the courtroom first, after which the Court would not make him attend the rest of the trial. (*Id.* at 12-14.) The deputy marshal indicated his scepticism that he would be able to persuade the defendant to peaceably come to the courtroom, noting that he would not like to "have to fight" the defendant to get him there. (*Id.* at 14, 15-16.)

About thirty minutes later, the deputy marshal reported that he had spoken again to the defendant but that the latter had been emphatic in his refusal to attend any part of the trial. The deputy had asked the defendant whether the latter would attempt to fight the deputies if they tried to force him to do so. The defendant responded that the marshals are "going to have to beat me" and that

12

he would "be kicking and screaming to go into the courtroom," and "if it's on, it's on." (*Id.* at 26-27.) According to the deputy, as he was responding, the defendant's back was against the wall, his voice was going up, and he was getting more and more excited. (Trial Tr. [236] at 27.) Given this exchange, the deputy recommended, as an alternative option, that any conversation between the undersigned and the defendant be in the lock-up interview room. (*Id.*) The undersigned and counsel then discussed how to make this cellblock colloquy occur without inciting the defendant's violent resistance to even that encounter. (*Id.* at 27-32.)

In short, as the defendant had said that he would not willingly come to the courtroom and that he would resist efforts to forcibly bring him there, the courtroom came to the defendant. That is, at 10:38 a.m., the judge, prosecutor, defense attorney, and court reporter walked to the lock-up area and assembled there inside an interview room[8] in which the defendant was already seated. The undersigned then began the trial proceedings in this case.

The entry of this entourage into the interview room area obviously surprised the defendant, who immediately became violent, kicking so hard against the door that the deputy marshals became alarmed and opened the door to remove him. The undersigned directed the marshals not to do so, but instead to close the door so that the

---

[8] In the interview room area, there is space for an attorney and others to sit and talk to the detained client, who is seated behind a plexiglass partition.

13

proceedings could continue. (*Id.* at 39.) Defendant responded, "I'm suing all you all motherfuckers." The undersigned then attempted to communicate with the defendant. (*Id.*)

This proceeding has been transcribed as part of the first day of trial, but a transcript cannot adequately convey the threatening demeanor of the defendant nor the rage that he exhibited throughout.[9] As he paced furiously back and forth, stopping to glare at the undersigned, defendant's conduct was extremely intimidating, even with a plexiglass partition separating him from the above group.

The transcript is difficult to follow because the defendant talked over the undersigned the entire time. In summary, the undersigned told the defendant that she wished he would reconsider his refusal to peaceably come to the courtroom, but that if not, a video and audio feed would be provided to allow him to follow jury selection, along with a note pad and pen, and a chance to speak to his attorney before the jury was finally selected. (Trial Tr. [236] at 40-42.) The Court also indicated that the defendant would be able to consult with his attorney during each day of trial. (*Id.* at 42.) The Court told the defendant that this was the way the trial would have to proceed if the defendant continued to refuse to be present in the courtroom, and that it was the defendant who was making this necessary. (*Id.* at 43-45.)

---

[9] The court reporter has made a tape recording of this proceeding, but even that cannot adequately convey the threatening physical demeanor of the defendant.

AO 72A
(Rev.8/82)

Throughout this difficult exchange, the defendant, talking over the undersigned, repeatedly said "I don't understand," a remark that he made 70 times.  He interspersed that comment with the statement, "I do not agree," shouting that out 27 times.  He also stated, "I am here against my will" and noted that the Court had no contract with him.

At the conclusion of this colloquy with the defendant, jury selection began immediately thereafter, in the courtroom, at 11:45 a.m.  (*Id.* at 45.)  Just prior to bringing the jurors in, the Court summarized what had happened with the defendant and spoke directly to the defendant, who was able to watch and hear the proceedings in his cellblock, urging him to reconsider his decision not to attend the trial.  The undersigned told defendant  that he could, if he wished, be brought to the courtroom, at any time, to join the proceedings. (*Id.* at 47-48.)

The trial proceeded with the video/audio feed, and with the defendant given an opportunity each day to consult with his attorney. After a 4 ½ day trial, the jury began deliberations and convicted the defendant on all counts.  ([159]-[167], [170], [178].)

**V.   DEFENDANT'S ADMISSION THAT HIS REFUSAL TO LEAVE HIS CELL WAS A PREMEDITATED LITIGATION STRATEGY TO INSULATE HIMSELF FROM A CONVICTION**

After the conviction, defendant's attorney filed a motion for new trial, arguing that the failure of the defendant to be present in the courtroom at the beginning of trial was in violation of FED. R.

15

CRIM. P. 43(a)and required a new trial.  ([190].)  The defendant,
himself, also filed a motion to be released from custody, arguing
that he had not had a "rational" or "factual" understanding of the
proceedings on that first day of trial and that the trial was
"nevertheless conducted with [him] in absentia against his will."
([206] at 1-2.)  This "void verdict of guilty," according to the
defendant, "operated as an acquittal." (*Id.* at 2.)

In responding to these motions, the Government offered evidence
of telephone calls made by the defendant while in custody to his
mother and brother, prior to and during trial.[10]  During those calls,
the defendant explained that he had devised a strategy, whereby he
would refuse to attend the trial, which action he believed would
prevent this Court from trying him or the jury from convicting him.
Specifically, shortly after the pre-trial conference, but before the
first day of trial, defendant telephoned his mother, expressing worry
that he might face up to 90 years in prison if convicted of the
Government's charges.  (Tr. [309-1] at 20.)  To avoid that unpleasant
outcome, defendant planned to make himself not "present" at trial, as

---

[10]   Consistent with jail policy, these calls were recorded with
the defendant's knowledge, and he has not contested the legality of
their interception.  Indeed, he was warned at the beginning of every
conversation that he was being recorded, and he acknowledged the
warning. (*See, e.g.,* [309-1] at 1, in which, at the beginning of a
conversation, defendant stated, "...[]does not consent to the
recording or the monitoring of this phone.  UCC 1-208, UCC 1-207 and
exempts this phone call for value.  What's up, baby?")  Later, he and
his mother laugh about and mock the fact that the conversation is
being recorded.  (*Id.* at 4.)

16

he had learned that "trial cannot commence...without the presence of the defendant." (*Id.* at 22.)  Defendant therefore wanted to know what "literally...constitutes your presence," (*id.* ("I'm tryin' to figure out this presence shit").)  For that reason, he requested that his mother research what it meant to be "present." (*Id.* ("What does 'present' mean?").)

In response, Mom, brother Paul, and the defendant brainstorm on this telephone call as to definitions of "presence" that the two family members had apparently found on an online legal dictionary. Defendant's mother indicates her discovery of a civil rule to the effect that "he who is incapable to giving a consent to an act is not to be considered present." (*Id.* at 24.)  Defendant wonders if just remaining silent and unresponsive during trial would suffice. (*Id.* at 25.)  The mother offers the possibility of the defendant sleeping during the trial to show his "incapability." (Tr. [309-1] at 24.) It is, however, when she reads from the book, as an example of incompetency, a "lunatic," that defendant has a "Eureka" moment:

> **PERKINS:** Oh, okay.  I got it.  I got to go straight plumb nuts before they even pick the jury.  That's what I gotta do.  I gotta go haywire on that bitch.
>
> ....
>
> ...I gotta be...plumb nuts before the shit even pop up...don't never...act sensible.  (Laughing)
>
> **MOTHER:** Yeah, you would be, "Dah, dah, dah, dah." (Laughing)
>
> ....

17

> **PERKINS:** That's how you gotta do it. "Who said I want to go trial.  I don't want to go to no mother fucking trial. I don't want no jury trial....How you gonna make me have a jury...This shit ain't popping off, you mother fucking bitch...."  And [I] just go crazy on that mother fucker.
>
> ....
>
> Yeah.  I need to get that down.  Okay.  You bitches want to play games.  This shit going to get real zoo-like. (Laughing).

(*Id.* at 26-27.)

Yet, notwithstanding some optimism at this potential strategy, in this same call, defendant's mother apparently remembered a prior incident in a different court where the defendant had acted crazy and fought the bailiffs, all to no avail:

> **PERKINS:** Nah.  But you see what happened with that though.
>
> ....
>
> ...I didn't get no consent.  I was fighting in the courtroom too.  Me and the bailiffs and shit.  They had me in there, man.  I had three (unintelligible) ordering this dude to let me go and this dude still just kidnapped me...for three months after that.  And I'm sitting there holding onto my release papers....

(*Id.*)

Perhaps for this reason, defendant continued to explore the concept of "presence" with his family members in his next conversation, again before trial.  The defendant appeared to have had mastered the concept of actual presence, but was concerned, that even if were he not in the courtroom, he could be deemed to be

18

constructively present.  This concern prompted a very long discussion among the family members of constructive presence at trial.  (*Id.* at 28-36.)  Defendant suggested that, by even appearing at the pretrial conference, he had made a mistake: "Yeah, I actually fucked up yesterday.  I had them too."  (*Id.* at 33.)  At the end of the conversation, the defendant stated he could not consent to be actually or constructively present.  (Tr. [309-1] at 36.)

The defendant spoke again with his mother before trial, again trying to arrive at precise definitions of "presence" and "absence." (*Id.* at 46-53.)  Defendant expressed concern at even starting the trial.  (*Id.* at 57 ("So that's what they're trying to get me to do tomorrow to start the trial.  Once the trial is actually started then they could just throw my ass out.").)  He acknowledges that "presence is the most essential thing I see they need...."  (*Id.* at 48.)  He also indicates that he will force the marshals to drag him into the courtroom: "No, ...[T]hey going to drag you over there and all that, gangster....they are going to drag you over there, force you in there, beat you up, see what I'm saying."  (*Id.* at 60.)

Defendant's next conversation with his mother was after the first day of trial, which trial had begun with the defendant refusing to even come to the courtroom, and the judge, prosecutor, defense attorney, and court reporter instead having gone to the lock-up to start the proceedings there.  As noted above, defendant had become violent and enraged when this group entered the interview room area

19

to speak to him.  In boasting about the incident to his mother, however, defendant was quite euphoric, apparently believing that he had outsmarted everyone.

> **PERKINS:** I went cold turkey on them bitches this morning. You hear me?

> **MOTHER:** Yeah.

> **PERKINS:** I didn't even go out there....[T]he judge kept sending people up there...trying to beg me to come down there and...talk on the record. You hear me?

> **MOTHER:** Yeah.

> **PERKINS:** ....I was like, no, fucker.

> **MOTHER:** Yeah.

> ....

> **PERKINS:** [T]hat bitch want me to come down there and contract, and I ain't having it, right?

> **MOTHER:** Yeah.

> **PERKINS:** So they kept sending people up there that was begging me...then they came threatening with all the chains and that kinda stuff.  You know, they were like are you going to fight us.  No, I ain't going to fight no mother fucking body. You come over here, and I'm going to [unintelligible] coercion.  I'm going to cuff up, but I'm not about to walk out there, mother fucker, ya'll drag me.  Ya'll going to beat the fuck out of me.  I'm not going to beat ya'll, ya'll going to beat me....

> **MOTHER:** Uh huh.

> **PERKINS:** ...And there's going to be...all kinds of lawsuits, everybody.  You hear me?

> **MOTHER:** Yeah.

**PERKINS:**    So...they couldn't rock it like that, right?

**MOTHER:**    Yeah.

**PERKINS:**    So look what they did.  They tried to make me come out to the visitation room to see that lawyer, right?

**MOTHER:**    Yeah.

**PERKINS:**    So, they came running out there.  Motherfucker, they tried to trick me right?...I go to the visitation...this woman is in a room with three chair....This bitch done brought the court, the whole court kit. (Laughing) Man, come on, this your son, Ma.

**PERKINS:**    ....

So, I kept on saying...and I kept saying it loud, talking over.  I kept saying I do not understand.   I don't agree.   I do not understand.  I do not understand.  I do not understand. I do not understand I don't agree. I don't agree....

....

Yeah, So the marshal, oh, it was like, man, we ain't never seen nobody do that shit.

....

And then, you know, cause they had locked me in a room and when I found out it was them, I was kicking the door.  Bloom, bloom, bloom, so they could let me out right. So the dude came over and opened up the door.  He didn't know what was going...I tore ass up out there.  And the judge was like. "Don't let him leave outa here.  Get him.   Get him."   So they grabbed me and everything.   So we scuffled and everything you know what I'm saying?  So...you know, those big ole mother fucking marshals, they managed to chunk me back in  the room... and shut the door. Locked...the door.  So, I'm saying ain't this a bitch.  'Cause they know...I have the right to

> not even...**Ma, I'm going to give you...the game right now.   I figured it out.   You ever get a charge...don't go to court.   Don't...Don't** (unintelligible).   **When they get you in the building,** you not, **you not going in that bitch**.

**MOTHER:**   Yeah.

**PERKINS:**   You don't board the ship....Fuck that.

(*Id.* at 65-66)(emphasis added).

In short, as he had indicated to his mother before trial, the defendant followed a different strategy than the one he had used at the pretrial conference (*id.* at 58), where he had showed up and repeated endlessly his "sovereign-citizen" script.   Instead, on the day of trial, the defendant refused to go to the courtroom and indicated that there would be a physical altercation if the marshals tried to force him.   Indeed, on the evening of the first day of trial, defendant indicated to his mother that, despite the Court's best efforts, he had outwitted everyone.   (*Id.* at 77-78 ("[T]he book says that trial doesn't start until [the defendant is] present...And...you have to be present when the first juror is sworn in...you have to be in the court and cross the bar...When I get out of this mother fucker, I ain't going to no court no more...I'm not even crossing the bar.").)

As the trial progressed, the defendant continued to discuss his strategy with his family members, revealing his knowledge of the "presence" requirement found in Federal Rule of Criminal Procedure 43, as well as pertinent case authority.   (*See generally* [309-1] at

22

82-126.)  At one point, the defendant references the language found in Rule 43(c)(1)(C), concerning the removal of a disruptive defendant from the court, and notes that "this retarded ass judge tried to use that one on me, right...[but] how this bitch going to remove me from the courtroom that I never entered?" (*Id.* at 87.)

As to the actual trial proceedings, themselves, however, they greatly bored the defendant, who complained that the video/audio feed interrupted his efforts to sleep. (*Id.* at 106 ("I was out at the boring ass court...[T]hey make me watch the shit on T.V...So they forcing me to do that.  Got me in there going crazy, man.  I can't sleep, man.  I keep hearing that shit, man.  They keep talking all this nonsense, man...[T]his here is full aggravating, dude.").)

## VI.  **SENTENCING**

The sentencing hearing for the defendant was held on February 25, 2013.  Once again, the defendant told the marshals that he would not come into the courtroom.[11]  Once again, the judge, defense attorney, prosecutor, and court reporter went to the lock-up area to inform the defendant of his right to attend the sentencing hearing and to hear from him any comments that he might wish to make.  On this occasion, though, the defendant planted himself on the toilet in his cell right before the group's arrival, and would not budge. After waiting for approximately ten minutes, the group returned to the courtroom to proceed with the sentencing hearing.  A live feed of

---

[11]  The sentencing hearing has not yet been transcribed.

23

the sentencing hearing was broadcast to the defendant's cell.

The presentence report had calculated an advisory guideline range of Offense Level 45, Criminal History Category IV, which called for an advisory range of Life, plus a 24-month mandatory, consecutive sentence for the identity theft conviction. The Court sustained defense counsel's objection to the loss calculations, and that resulted in a final offense level of 39, which yielded an advisory range of 360 months-life, to be followed by the 24-month mandatory consecutive sentence. The Government recommended a downward variance to a 360-month sentence, thereby eliminating the consecutive sentence. The Court concurred and that was the sentence imposed. The Court left the record open to give the defendant an opportunity to submit any remarks in mitigation or otherwise comment on the sentence. Defendant has still offered no response.

## DISCUSSION

### I.    DEFENDANT'S MOTION FOR A NEW TRIAL

Defense counsel[12] has filed a motion for new trial [190].[13] Defendant argues that pursuant to FED. R. CRIM. P. 43(a), a defendant

---

[12] Defendant, *pro se,* filed a similar motion [206]. Besides arguing that Rule 43(a) was violated, defendant asserts that he did not have a "rational" or "factual understanding of the proceedings against him" and that the trial was conducted "in absentia against his will." (*Id.* at 1.) For simplicity's sake, the Court will refer to defense counsel's motion as defendant's motion.

[13] The motion was styled, alternatively, as a motion for judgment of acquittal. As the defendant has asserted no grounds for an acquittal, the Court will deem the motion to be one for new trial, only.

AO 72A
(Rev.8/82)

must be present at every trial stage and that the conditions for a waiver of his presence, as set out in Rule 43(b)(1), were not met. Specifically, defendant argues that before the Court was free to accede to his insistent and repeated refusal to attend the trial, the defendant had to be present, even if only for a moment, during jury voir dire.[14]

A court may vacate a judgment and grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a).   The decision to grant a motion for new trial is within the Court's discretion. *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994).

For the reasons set out below, the Court concludes that the defendant was initially present at trial, that he thereafter constructively waived his continued presence, and that the "interest of justice" greatly disfavors granting defendant's motion for a new trial.

### A.   Options Available to Court

Before discussing the legal framework in which the present issue should be analyzed, it is helpful to examine the limited options available to the Court as a result of the defendant's hyper-aggressive and threatening behavior: behavior of a degree and kind that the undersigned has never before witnessed in twenty-one years

---

[14]   Actually, the defendant, *pro se*, argues that he had to be present during jury impanelment.

25

on the bench.

Other than handling the matter as it did, the Court's only other option[15] was to require the marshals to force the defendant into the courtroom over what the Court believed would be the defendant's violent resistence.  Certainly, there were ample reasons for that concern.  The defendant had displayed increasing rage during the recent pretrial conference, as he attempted to sabotage the proceedings by shouting so loudly over the Court that it was difficult to hear what the undersigned was saying.  So extreme was defendant's behavior in that proceeding that it prompted the Court to talk with counsel about what arrangements would need to be made if the defendant had to be sent out of the courtroom for disruptive behavior.

Then, on the morning of trial, defendant upped the ante, by announcing in lock-up, to the marshals, that he was not going to court.  The undersigned did not give into defendant's demand at that point,[16] indicating that she would like the defendant to be present at least for part of jury selection.  Instead, the Court directed the

_____

[15]   The defendant envisioned a third option in which  the Court would suspend the trial forever, given the defendant's refusal to attend, and then the Court would be forced to dismiss the charges. Obviously, if a defendant could gain dismissal of his charges  merely by refusing to come to the courtroom, no defendant would ever again agree to come to any courtroom nor would any defendant ever again be convicted.

[16]   Indeed, in conversations with his mother, the defendant mocked the undersigned for her efforts to try to coax the defendant into voluntarily coming into the courtroom.  (*See* Tr. [309-1] 65-66.)

26

marshal to go back to the defendant and to make every effort to get the defendant simply to come to the courtroom to repeat these remarks to the Court.

The deputy marshal did so, and reported back that the defendant's attitude was even more determined. In response to the deputy's question, the defendant had responded that the marshals would have to beat him and that he would be kicking and screaming if they tried to take him into the courtroom, noting: "If it's on, it's on." All the while, the defendant was backed up against the wall, with his "voice level going up, getting more excited." *See supra* at 12.

At that point, the Court acceded to the deputy's suggestion that, instead of provoking a physical confrontation, the undersigned and counsel would go to the lock-up area to confirm the defendant's intentions. As described above, when the undersigned, the lawyers, and the court reporter arrived in the interview room area where the defendant was seated, he became extremely violent, kicking so hard at the door that the marshals came in to see if he needed to be removed. Speaking loudly and talking over the undersigned the entire time, the defendant was so enraged that the undersigned believed that, had there not been a plexiglass partition, the defendant may well have assaulted one of the members of this group.

After all the above had happened, there was only one conclusion that could reasonably be drawn: if the undersigned had required the

AO 72A
(Rev.8/82)

marshals to bring the defendant into the courtroom for jury selection, there would be a violent physical confrontation and someone could get hurt.[17]  Of course, deputy marshals understand that it is part of their job to deal with dangerous people who may well try to do them harm.  Had the Court directed them to get the defendant into the courtroom, whatever way they could, the deputies would no doubt have followed those instructions.  Yet, the fact that a marshal's job can involve risks to his safety does not mean that he should be gratuitously forced into a violent physical confrontation when such an altercation could readily be avoided.  Here, a physical skirmish with the defendant, in and outside the courtroom, clearly could be avoided.  The defendant had repeatedly told the marshals that he did not want to enter the courtroom and that there would be hell to pay if they tried to make him do so.  As this threatened mayhem could be prevented by allowing the defendant to forego his presence in the courtroom, prudence and a respect for the physical well-being of all involved gave the Court no reasonable alternative but to accept the defendant's constructive waiver of his right to be present at the trial.

Plus, getting the defendant into the courtroom would have been just the first act of this in-court street theater that he had

---

[17]  In fact, in his conversations with his mother, the defendant had envisioned and even seemed to welcome that possibility, telling her that the marshals could look forward to lots of lawsuits should they injure him in any way.  (*See* Tr. [309-1] 65-66.)

AO 72A
(Rev.8/82)

planned. Once there, it is doubtful that he could been kept under control without restraints so extensive that they would have been visible to incoming prospective jurors.   The defendant would have literally had to be chained to the table to keep him from flailing around.   And chains would not have stopped his loud and incessant shouting.   Short of the marshals muzzling the defendant, thereby giving him a menacing Hannibal Lecter-like look, the jurors would have been greeted with the unceasing and furious ravings of a seemingly crazed person. Indeed, the defendant had told his mother that it would be part of his trial strategy to act like a "lunatic." (*See* Tr. [309-1] 26-27.)

Clearly, the sight of a heavily-manacled, ranting defendant, hovered over by a circle of anxious guards, would have given the jurors a very negative impression of the defendant. And, for sure, had the Court gone that route, the defendant would now be complaining that the Court had not only disregarded his right to be absent from the proceedings, but worse, by forcing him to be present under the above circumstances, had needlessly created substantial jury prejudice against him.

In short, through his own carefully planned actions, the defendant left the Court no other reasonable alternative, except to give in to his demand that he not be forcibly taken to the courtroom.

B.   **Requirements of Rule 43**

1.   Background to Adoption of Rule 43

29

Rule 43 provides the legal framework in which to analyze the propriety of trying all or part of a case when a defendant is absent. Rule 43 states that a defendant must be present at every stage of the trial, including jury impanelment. FED. R. CRIM. P. 43(a). The rule nevertheless allows a defendant to waive his presence during a trial in two circumstances. Specifically,

> (c)(1) In General. A defendant who was initially present at trial...waives the right to be present under the following circumstances:
>
> > (A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;
> >
> > ....
> >
> > (C) when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.

FED. R. CRIM. P. 43(c)(1)(A) and (C).

The adoption of these two provisions codified caselaw addressing the two typical situations in which a defendant could properly be tried in absentia: (1) when the defendant flees after the trial has begun or (2) when the defendant becomes so disruptive during trial that he has to be removed from the courtroom.

It is the first provision--Rule 43(c)(1)(A)--that is at issue in this case. An examination of its origin and development provides a useful backdrop for considering the defendant's contention here. Adoption of the principle contained in the present version of the

30

rule--that a trial may be continued after a defendant has fled or voluntarily absented himself during that trial--can be found in the original iteration of Rule 43, adopted in 1944.[18]   The Advisory Committee Notes indicate that this part of the rule "is a restatement of existing law," and cites to a Supreme Court case, *Diaz v. United States*, 223 U.S. 442, 455-56 (1912), and to three lower court federal decisions.[19]   FED. R. CRIM. P. 43, Advisory Committee Notes, 1944 Adoption at 2.

In 1993, the Supreme Court reemphasized that the above provision of Rule 43 permitting trial in absentia of a defendant who had fled (or voluntarily failed to appear) was limited to those defendants who had fled after the "commencement of trial;" flight before trial would not permit a trial in the defendant's absence.

---

[18]   Rule 43

> (b) CONTINUED PRESENCE NOT REQUIRED.  The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present,
>
> > (1) is voluntarily absent after the trial has commenced.

FED. R. CRIM. P. 43(b)(1), Advisory Committee Notes, 1944 Adoption.

[19]   *United States v. Noble*, 294 F. 689, 692 (D. Mont. 1923); *United States v. Vassalo*, 52 F.2d 699, 700 (E.D. Mich. 1931); *United States v. Barracota*, 45 F. Supp. 38, 38 (S.D.N.Y. 1942).  In contrast to the present case, the defendants in *Diaz* and each of these three cases were on bond.  Indeed, the Supreme Court in *Diaz* did not envision a defendant who was in custody as ever being able to waive his right to be present, as such a defendant's "presence or absence is not within his own control."  *Diaz,* 223 U.S. at 455.

31

*Crosby v. United States*, 506 U.S. 255, 261 (1993).

In *Crosby*, the defendant had been on bond and failed to show up on the scheduled day of trial, having apparently fled the preceding day. Notwithstanding Crosby's failure to show up on the first day of trial, or any day thereafter, the district court conducted the trial anyway. *Id.* at 257-58. The Supreme Court reversed the conviction, noting that the district court's action violated Rule 43.

The Court further explained that maintaining a distinction between flight before and flight during a trial ensured that the defendant's waiver of his presence was a knowing waiver. That is, while one could reasonably impute to a defendant who flees during trial knowledge that the proceeding will continue in his absence, one could not impute such knowledge to a defendant who, for a variety of reasons, may not have shown up for the first day of trial. *Id.* at 261-262.

In describing the kind of defendant who could waive his presence at trial, the 1995 amendments to Rule 43 modified the then-existing phrase "a defendant who was initially present," to read "a defendant who was initially present at trial," (emphasis added). Citing to *Crosby,* the Advisory Notes indicated that this revision was done to "make clear that the trial of an absent defendant is possible only if the defendant was previously present at the trial...." FED. R. CRIM. P. 43, Advisory Committee Notes to 1995 Amendments at Subdivision (b).

32

2.   <u>Application of Rule 43(c)(1)(A) to This Case</u>

Although defendant almost certainly would have run afoul of subsection(c)(1)(C) of Rule 43 (allowing removal of a disruptive defendant from a trial) had he attended any of the trial, because the defendant refused to enter the courtroom, it is only subsection (c)(1)(A) that is pertinent in this case.  That subsection, when considered together with the language in subsection (c)(1), provides that a defendant who was initially present at trial waives the right to be present when he is voluntarily absent after trial has begun.

Clearly, the defendant was voluntarily absent after the trial had begun.  He repeatedly and insistently refused to be brought to the courtroom.  Moreover, the telephone calls between him and family members reveal that his refusal was part of a carefully-thought-out plan. Defendant argues, however, that he was never "initially present at trial" and that, accordingly, any waiver of the right to be present was invalid.  Leaving aside the fact that this objection was never made by counsel or the defendant at the time that the Court acceded to defendant's demand that he not be required to attend the trial, the Court disagrees that the trial had not begun when the defendant, in the interview room, constructively waived his right to be present.

The defendant says that a trial starts only when voir dire has actually begun: that is, when jurors are in the courtroom and the Court starts talking to them.  It is true that the beginning of voir

33

dire is one of the first things that happens in a trial, but it is not *the* first thing. Instead, a trial begins in this district when the court is called to order for purposes of trying the particular case, at a time when the defendant, his attorney, and counsel for the Government are in attendance. It is at this time that the Court ensures that the defendant is ready to proceed with designated counsel and that there are no substantial reasons why voir dire cannot immediately begin. It is also at this time that the Court explains how voir dire will work and indicates whether there are any particular jurors who have expressed a problem with jury service or who might have offered a ground for being excused.

Admittedly, this first part of the trial proceeding is almost always brief. The Court does not delve into motions in limine or otherwise allow dawdling, as jurors are typically a short distance away, lined up and poised to enter the courtroom. Nevertheless, brief though this session may be, voir dire would never begin without first having had this short convocation and assuring that the defendant and all other necessary parties were, in fact, present and ready to go. Then once this part of the proceeding concludes, voir dire begins immediately thereafter.

In this case, the undersigned decided that if the defendant would not go to court for the above part of the trial proceeding, the court would go to the defendant. And so it did, with the judge, court reporter, counsel for the defendant, and prosecutor traveling

34

to the lock-up area of the courthouse to begin the trial.  There is no requirement that a judicial proceeding has to be in a courtroom. A courtroom is just a particular room in a courthouse.  With all of the above individuals assembled, the necessary people were in place to begin the trial, and, in the Court's view, the trial began when the undersigned and counsel walked into lock-up and started those proceedings.

Admittedly, it was a difficult proceeding to get through and the undersigned perhaps did not say all the things she normally would have said at this stage of the trial, given the difficulty of speaking over the defendant's loud and raucous rants.[20]  Nevertheless, once this proceeding in lock-up had concluded, the judge, court reporter, and attorneys returned to the courtroom, the prospective jurors entered that courtroom, and voir dire began.  Further, while the defendant refused to enter the courtroom for voir dire or any other part of the trial, he was able to watch and listen to all proceedings through the audio/video feed in his cell.  In addition, his attorney visited with him throughout the trial, to the extent that the defendant would agree to see his attorney.  Finally, speaking through the audio/video feed, and out of the presence of the jury, the Court, throughout the trial, repeatedly invited the defendant to join everyone in the courtroom.

---

[20]   For example, the Court did not formally call the case to order, as it would normally do in the courtroom.

3.   <u>Case Authority</u>

While there have been few cases that have dealt with the type of situation presented here, those appellate courts that have addressed this issue have not found Rule 43 to be violated when a judge acts as the undersigned did here.  That is, these appellate courts have not required that marshals, at the risk of injury, be required to forcibly transport a resistant defendant into the courtroom merely so that the latter can make a 30-second appearance before the jury venire and thereby insulate the trial court from any challenge based on Rule 43's "initially present at trial" requirement.

In *United States v. Benabe*, the district court preemptively removed two of seven defendants on the day prior to jury selection. Those two defendants never made an appearance inside the courtroom, and were convicted in absentia by the jury. The Seventh Circuit, however, refused to reverse based on the court's non-compliance with Rule 43.  *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011).  In *Benabe,* the above two defendants had behaved so disruptively in the pretrial conference[21] that the district court determined that their presence at any phase of the trial, including voir dire, would make a fair trial for the other defendants impossible.  Therefore, the judge directed that these defendants not even be present at voir dire, unless they promised not to further obstruct the proceedings;

---

[21]  The two defendants were also "sovereign citizens," and their antics are set out at length in the Seventh Circuit's opinion.  *Id.* at 761-64.

36

the defendants refused to do so.  Defense counsel objected that the court should at least wait until these two defendants acted up before removing them, but the district judge concluded that removal at that point would likely be too late, as the rantings of these two defendants would taint the entire venire in a complex, long-scheduled multi-defendant trial.  *Id.* at 761-65.

Writing for the Seventh Circuit, Judge David Hamilton held that the defendants had waived their constitutional right to be present at the trial, as their waiver, made through their continuing obstructive conduct, was knowing and as the public interest[22] supported the judge's decision.  *Id.* at 766-71.  As to any non-compliance with Rule 43, the defendants had argued that the rule requires that a defendant be "initially present at trial," before being removed.  *Id.* at 771. As to what the above phrase means, in practical terms, the defendants contended that a defendant "must be physically present at the moment when the first prospective jurors enter the courtroom."  *Id.* at 771.

The Seventh Circuit noted that, besides the fact that the above standard would be of little use in a bench trial:

> We do not read the rule's language as being quite that precise, given different courts' varied practices in managing jury selection, especially when a defendant is in custody and must be moved and managed out of the sight and hearing of prospective jurors.

---

[22]  The opinion noted, "Modern American courts simply do not have the luxury of time to indulge the obstructionist tactics of these defendants.  Budgets, calendars, and administrative capacities are already too strained."  *Id.* at 770.

37

*Id.* at 771.   Instead, the Seventh Circuit concluded that "the phrase 'initially present at trial' in a jury trial *must refer to the day that jury selection begins, though not to the precise moment that one or more prospective jurors enter the courtroom*." *United States v. Benabe*, 654 F.3d 753, 771-72 (7th Cir. 2011)(emphasis added).

Thus, in *Benabe* the trial began on the day that the jury selection process began.   Of course, as the district judge had removed these two defendants on the day before jury selection, the Seventh Circuit noted that he had not complied with the language of Rule 43(c)(1).   Further, the court acknowledged the Supreme Court's holding in *Crosby* that "Rule 43 means what it says."   *Id.* at 772. Yet, as the circuit court noted, Rule 52(a) also means what it says when it provides that errors or variances that do not affect substantial rights must be disregarded.   The court concluded that an order removing the defendants on the day before jury selection began, instead of the day it actually began, "was an error that did not affect these defendants' substantial rights."[23]   *Id.*

───────────────

[23] The appellate court did note that it probably would have been better if the district court had brought the defendants back to the courthouse on the morning of jury selection, without any jurors present, to ask again whether they would reconsider their constructive decision not to attend trial. But the Seventh Circuit assumed that, given their past behavior, these defendants would have refused to promise to behave.   Further, unlike the defendant in *Crosby*, who had had no warning that a trial might be held in his absence when he fled the day before trial, these defendants did not flee or fail to appear.   Instead, they were repeatedly warned that the trial would go forward without them unless they promised to behave, and they made a knowing and voluntary choice not to do so, including choosing not to even be taken to the courthouse on the

38

Finally, rejecting the defendants' argument that their absence from trial was a structural error requiring automatic reversal, the court noted that, as the defendants had waived their right to attend trial, as a constitutional matter, the "narrower error under Rule 43 was only the precise timing of the exclusion order.  The defendants' absence at the instant the trial technically began was not 'a defect affecting the framework within which the trial proceeds.'"  *Id.* at 773 (citations omitted).  In summary,

> [t]o require <u>automatic reversal for a violation of Rule 43 based on a defendant's absence at the moment trial begins would only reward these defendants for their obstructionist campaign</u>....<u>A per se rule would invite future defendants to attempt similar obstructionist tactics</u>, including waiving their right to be present from their jail cell on the day of trial. We see no reason to expand the limited list of structural rights whose violation constitutes per se error by adding the defendants' Rule 43 right to be present at the inception of trial.

*Id.* at 773-74 (emphasis added).

Thus, the Seventh Circuit concluded that, for purposes of Rule 43(c)(1)(A), a jury trial can be said to have begun on <u>the day</u> that jury selection begins.  One does not have to wait until "the precise moment that one or more prospective jurors enter the courtroom" to deem the trial to have started.  *Id.* at 771-72.  Applying that principle here, the trial of defendant Perkins started the morning of jury selection, and began no later than the time when the undersigned marched down to lock-up with the other trial participants to start

---

morning of trial.  Likewise, at any time during trial, they could have returned to attend, and never chose to do so.  *Id.* at 773.

AO 72A
(Rev.8/82)

the trial proceedings in the defendant's presence.   Jury selection
began immediately after that session with the defendant in the lock-
up area.

     Likewise, in *Cuoco v. United States*, 208 F.3d 27 (2d Cir. 2000),
the Second Circuit took the same approach as did the Seventh Circuit,
in refusing to reverse a conviction as a result of the defendant's
voluntary non-attendance at jury selection or any other part of the
trial.   In *Cuoco,* the defendant had attended a suppression hearing
that was held immediately before voir dire.   When that hearing had
concluded, the district judge suggested that the defendant change out
of his prison clothing, as the potential jurors were about to be
brought into the courtroom for voir dire.   The defendant declined the
offer and stated that he did not want to be present.   After a
colloquy with the defendant confirming his understanding of the
substantial downside of this decision, the district court acceded to
the defendant's request, and voir dire and the trial proceeded in his
absence.   Appellate counsel did not seek reversal based on the
defendant's absence from the trial proceedings, but in a subsequent
§ 2255 motion, the defendant argued that appellate counsel's failure
to do so constituted ineffective assistance of counsel.   *Id.* at 29-
30.

     To address this claim, the Second Circuit necessarily had to
examine the likelihood that an appeal based on this alleged Rule 43
error would have succeeded.   Doing so, the Second Circuit found

40

unpersuasive the defendant's argument that his conviction would have been reversed had his appellate counsel raised this issue.[24]   First, the court disagreed with the defendant that the Supreme Court's decision in *Crosby*[25] could be interpreted as holding that a defendant who waived his right to be present at trial, immediately prior to voir dire, had not been initially present at trial.  *Id.* at 31.  The court noted that *Crosby* concerned a defendant who had fled prior to trial and that its holding could not be expanded beyond what it had ruled: that a defendant who flees prior to the day in which trial starts cannot be tried in absentia.  *Id.*  Cuoco had not fled, but was in the courthouse on the day that trial began and was in the courtroom just minutes before voir dire started.

As to the question of when a trial can be said to begin in such circumstances, the Second Circuit noted that a defendant has a right to be present at jury selection because a "trial begins *no later* than voir dire."  *Id.* at 32 (emphasis in original).  Nevertheless, when a defendant is present immediately prior to voir dire, at a time when

---

[24]   The Court did not make an absolute pronouncement on this point, stating "we think it very unlikely that this court would have reversed Cuoco's conviction based on his voluntary absence from the trial" and "[n]ot only is it unlikely that a Rule 43 argument would have resulted in reversal...but the timing of the *Crosby* decision gave appellate counsel little time to decide what, if any, application it might have to Cuoco's appeal."  *Id.* at 31-32.  Notwithstanding this disclaimer, with the exception of one sentence concerning the question whether appellate counsel's performance was lacking, the rest of the opinion reflected the Court's rejection of Cuoco's argument that Rule 43 had been violated in his case.

[25]   *United States v. Crosby*, 506 U.S. 255 (1993).

41

"the jury venire was in the courthouse," a conclusion that "the trial already had begun" served the "policy of requiring a knowing and voluntary waiver of Rule 43." *Id.*

Albeit with less discussion, the Second Circuit adhered to the approach taken in *Cuoco* in *United States v. Lucky*, 569 F.3d 101 (2d Cir. 2009). There, at the time that jury selection was to begin, the defendant refused to attend that proceeding unless the court first decided his pretrial motions. After an extended exchange with the magistrate judge who was about to conduct the voir dire, the defendant left the courtroom and went back to lock-up. *Id.* at 104. Thereafter, the district judge met with the defendant and got the latter to agree to attend jury selection, which had now been put off until the afternoon as a result of defendant's disruption of the scheduled morning voir dire. *Id.*

When the time came for jury selection, however, the defendant broke his earlier agreement, stating that he was peacefully protesting the judge's refusal to immediately decide his pretrial motions by his own refusal to put on street clothes or to participate in jury selection. This announcement created more delay as the judge and counsel discussed their options. At some point, the marshal reported that the defendant refused to come out of his cell and would have to be removed by force. The judge did not believe he should be required to force the defendant out of his cell and asked if the defendant would come out for just a moment to talk to him; the

42

defendant refused.  *Id.* at 105.

All of this folderol meant that jury selection now had to be put off until the next day.[26]  On that next day the judge began jury selection with the defendant absent.  On appeal, the Second Circuit concluded that the defendant had knowingly waived his presence for jury selection and that the public interest was served by beginning voir dire in his absence.[27]  *Id.* at 108.

The Fourth Circuit has likewise rejected an argument that a Rule 43 error occurred when a district court, at the request of the defendant, allowed the latter to leave the courtroom "throughout jury selection and the presentation of evidence" before returning for the return of the jury's verdict.  *United States v. Lawrence,* 161 F.3d 250, 252 (4th Cir. 1998).  Defendant's request occurred when the case

---

[26]  A detailed recitation of the impudent, childish behavior exhibited above and in the other cited cases may make for tedious reading.  It is important, however, to convey that these issues involve more than just abstract principles.  Instead, a blow-by-blow description serves to demonstrate how much of a district judge's scarce time and energy is gobbled up by these obstructionist tactics and how difficult it is to figure out, as a practical matter, how one can proceed in order to actually have a trial (and preferably one where no one gets injured) balanced against the need to comply with a phrase in a rule that was adopted at a time when the drafters obviously did not envision that recalcitrance and obstructionist tactics, not flight, would be the primary reason for the absence of defendants at trial proceedings.

[27]  There was a wrinkle in this case, in that defendant Lucky actually returned to court after jury selection was over.  But that is a distinction without a significant difference for purposes of the present issue, as the defendant was absent for jury selection.  If, for purposes of Rule 43(c)(1), jury selection is deemed to be the time of trial at which a defendant must be "initially present," then that condition was not met in defendant Lucky's case.

was called, at which time the defendant asked to be allowed to be absent until the verdict was returned. *Id.* at 255. Notwithstanding the defendant's absence during voir dire, the court consistently indicated that the defendant had been present at the beginning of his trial. *See, e.g.,* "On the day of trial, and after its beginning...", *id.* at 252 and "[B]ecause Lawrence was present at the beginning of his trial and voluntarily absented himself, there is no error in this case," *id.* at 255. Moreover, the Fourth Circuit held that even if there were error, "it is invited error brought on at Lawrence's own request and, as such, is not reversible." *Id.*

The above discussion of cases from other circuits leads finally to a discussion of a case from this circuit, and it is a case on which the defendant relies in arguing that Rule 43 was violated. In *United States v. Bradford*, 237 F.3d 1306 (11th Cir. 2001), the defendant, Bridgette Bradford, was transported to court without incident on the day of jury selection. While a jury was selected, it was not sworn that day. When trial began eleven days later, the defendant, who was on trial for assaulting federal prison officers, refused to be transported to court. Given the defendant's similarly contrary conduct in refusing to attend pretrial conferences, and the marshal's concerns about forcibly making her go to court,[28] the

---

[28] The defendant was charged with, and convicted of, poking one officer with a mop handle and with throwing a cup of urine on another officer, a few hours after having requested an AIDS and herpes test. *Id.* at 1307 and 1308 n.2. Rule 404(b) evidence indicated that the defendant had thrown a cup of feces at a third officer and had spit

44

district court determined that she had waived her right to be present during trial. *Id.* at 1308.

On appeal, the defendant argued that, by allowing the defendant to be tried in absentia, the district court had violated Rule 43(c)(1)'s requirement that she be present at the beginning of trial. Specifically, the defendant argued that a trial begins only when a jury has been impaneled and, as the defendant was present only when the jury was selected, but absent when it was subsequently impaneled, she had not been "initially present" at trial. The Eleventh Circuit rejected that argument, holding that "a 'trial has commenced' when the jury selection process has begun." *Id.* at 1310.

Accordingly, the defendant here argues that as the Eleventh Circuit had pegged the starting time of the particular trial before it as the beginning of the jury selection process and as defendant Perkins was not present, at least in the courtroom, during jury selection, Rule 43(c)(1)(A) was violated. The Court disagrees. While it is true that the Eleventh Circuit opinion made the above statement, that statement was made on facts significantly different than those presented here, and its holding should be limited to those facts. That is, defendant Bradford *had* been present at jury selection. The Eleventh Circuit rejected her argument that the trial began at a later point when she was not present. The court did not address what the outcome might have been had the defendant not been

---

at a fourth. *Id.* at 1308 n.2.

45

present at jury selection.

As such, to the extent that one might read the opinion as applying to a situation in which a defendant had not been present at jury selection, such an implied statement by the panel would be dictum. The Eleventh Circuit has repeatedly held that dicta does not constitute precedent:

> [w]e have pointed out many times that regardless of what a court says in its opinion, *the decision can hold nothing beyond the facts of that case* . . . All statements that go beyond the facts of the case–and sometimes, but not always, they begin with the word 'if'–are dicta . . . And dicta is not binding on anyone for any purpose.

*Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) (citations omitted)(emphasis added). *See also United States v. Hunter*, 172 F.3d 1307, 1310 (11th Cir. 1999)(Carnes, J., concurring) "[t]he holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." This is so because, "[u]nlike judicial holdings, dicta does not carry with it the added assurance of having survived what for the judiciary amounts to a kind of peer review . . . . [f]or these reasons, among others, dicta in our opinions is not binding on anyone for any purpose . . . dicta in our opinions cannot establish either the law of the circuit, or even the law of the case." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1314-15 (11th Cir. 1998)(Carnes, J., concurring).

Unpacking the above-quoted statement in *Bradford* to limit the holding to its facts, thereby removing any dicta contained therein,

46

the statement can be revised to read as follows: "A trial begins no later than jury selection.  Accordingly, if a defendant who is later absent during the trial has been present during jury selection, that defendant can be said to have been 'initially present at trial,' as required by Rule 43(c)(1)."  In other words, a trial commences before a jury is sworn, and has started at least by the time of jury selection.

Finally, even if *Bradford* could be read as holding that a criminal trial begins only at the point that voir dire begins, it would conflict with earlier precedent by the Eleventh Circuit.  In *United States v. Crews*, 695 F.2d 519, 520 (11th Cir. 1983), the defendant was hospitalized in Boise, Idaho when jury selection was to have begun.  His attorney and the prosecutor decided to go ahead and strike the jury, but to delay swearing in the jury until the defendant had signed a written waiver of his presence for jury selection.  The defendant did so two days later, while still in Boise.  When the defendant arrived in the district and the jury was to be sworn, he reaffirmed to the trial judge that he had waived his right to be present when the jury was struck.  (*Id.* at 520.)

On appeal, the defendant claimed a Rule 43(a) violation as a result of jury selection having started in his absence. The Eleventh Circuit rejected the argument:

> Though rule 43 is silent as to whether one charged with a
> felony can waive his right to be present during jury
> selection, we conclude that such waiver can occur, and that
> it occurred in this case.

47

(*Id*. at 520.)  The court noted that because the defendant had been advised by his attorney of his right to be present during voir dire, had advised the trial court of his waiver of that right, and had proceeded to trial and verdict without objection, "a knowing waiver of the rule 43(a) right in question has occurred."  *(Id*. at 521.)

In this case, defendant Perkins was advised of his right to be present during voir dire.  Through his refusal to enter the courtroom, he waived that right.  The trial proceeded to its conclusion without any objection by the defendant to his absence. Indeed, he had adamantly refused to attend the proceedings.  Thus, while the facts here differ from those in *Crews*, the principle applied there for waiver of presence at jury selection was met in this case as well.

> 4.   <u>Conclusion</u>

In drafting Rule 43(c)(1)(A), the drafters appear to have envisioned a defendant who, having initially shown up for trial, has, during the trial, fled (if on bond) or escaped and fled (if in custody).  There are many reasons why a defendant on bond may not have shown up for trial at the outset.  As *Crosby* noted, requiring the defendant's initial presence at the proceedings insures that his later absence can fairly be considered a knowing waiver of the right to be present.  Thus, to insure that a defendant's waiver was knowing, Rule 43(c)(1) requires that he must have been present when the trial began, no matter how limited in duration was his actual

48

attendance.

The type of defendants whose absence now seems to be prompting the most use of Rule 43(c)(1)(A) are not those fugitive defendants that the rule seems initially to have envisioned. Instead, the rule is now often triggered by defendants in custody who refuse to attend their trials. One might think, and probably the drafters thought,[29] that such defendants have no choice but to attend their trials if directed by the court to do so. But as it turns out, these defendants are exercising more leverage over that decision than one might initially anticipate. Having read "sovereign citizen" literature while they are in custody, some of them have decided that their best strategy is to resist attending any part of a trial, thereby defeating that part of Rule 43 that says they must be initially present. Unfortunately, the resistance that they threaten is not always of the passive type.

For sure, a court could require the marshals to use whatever force is necessary to physically compel these resisting defendants into submission, and into the courtroom. But where there is an alternative, this does not seem like a very good practice either for the defendants who could be injured, or for the marshals, who could also get hurt and who could well become defendants in a § 1983 suit. Nor is it a good idea for the court system. Trials should not become the judiciary's version of the Jerry Springer show. Besides,

---

[29]    *See supra* at 31 n.19.

requiring that a manacled, shouting defendant make a one-minute cameo appearance before aghast jurors, who probably had anticipated a speck more dignity in their federal jury service, seems to be a high price to pay to satisfy one rather indefinite phrase in Rule 43: "initially present."

Now, the fact that the rule may not have been focused on the type of absent defendant becoming more prevalent in federal criminal litigation does not mean that courts can throw the rule, or any part of it, out. Rules are rules, after all. But it does mean that in determining the definition of "initially present," a court should craft that definition with an understanding of the underlying purpose of the "initially present" requirement. As *Crosby* noted, a key purpose of the rule is to ensure that a defendant's waiver of his right to be present is a knowing one. Requiring a defendant to be present at the outset of the trial, and to waive his presence at that time, gives some concreteness and immediacy to the decision, and sharply focuses a defendant on the ramifications of continuing to bluster.

In the present case, the undersigned concludes that the above purpose was accomplished at the time when the trial was set to begin. Immediately before voir dire, when jurors were assembled and ready to be brought into the courtroom, the judge, the attorneys, and the court reporter took the extraordinary step of going to the lock-up area to begin the trial in the defendant's presence. The immediacy

50

of the trial and the concreteness of his decision was certainly
apparent to the defendant, who, through his words and conduct,
clearly gave a persistent and knowing waiver. Forcing the defendant
to actually come into the courtroom, for no other reason than to have
the jurors briefly eyeball him, would have served no good purpose,
but instead would have endangered the safety of all assembled,
prejudiced the defendant before the jury, and undermined the dignity
of the court. As the trial began in lock-up and as defendant was
present there, the Court concludes that defendant's motion for new
trial should be denied.

      C.   **Invited Error**

     The Government argues that even if it was error not to make
defendant be present in the courtroom during jury voir dire, any
error was invited by defendant's conduct and therefore does not
warrant a new trial for defendant. (Gov't's Br. [241] at 23.) The
Court agrees.

     The invited error doctrine typically applies where a defendant
or his attorney has agreed to, or provoked, the trial court's action,
yet later objects to the court's action as improper. *See, e.g.,*
*United States v. Harris*, 443 F.3d 822, 824 (11th Cir. 2006); *Ford ex*
*rel. Ford v. Garcia*, 289 F.3d 1283, 1294 (11th Cir. 2002). The
invited error doctrine essentially precludes a defendant from waiving
an objection at trial only to reassert the argument at a later date.
*United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009)("if a

51

party waives a procedural right or agrees to the admissibility of certain evidence, he cannot later complain that any resulting error is reversible.").

Based on Perkins' repeated assertions that he did not wish to participate in his trial, as well as recordings revealing Perkins' intention to trick the Court and thereby void any subsequent conviction, the Court concludes that Perkins invited any Rule 43 error that may have occurred. Further, neither he nor his attorney objected at any time to the procedure that the Court followed.

In short, for all the above reasons, the Court **DENIES** defendant's Motion for A New Trial.

## II. PENDING *PRO SE* MOTIONS

The defendant, *pro se*, has filed several motions. They are: Motion to Discharge the Defendant [206]; Motion for Immediate Release of Movant by Bond [263]; Motion to Quash Detention Order [265]; Motion for Removal From Facility, or in the alternative, Full Discharge from Custody [266]; Motion to Quash C.J.A. 20 Appointment [267]; Motion for Order to Restrain and Terminate Appointed Counsel [282]; and Motion for Recusal of Judge [283]. Many of them have been subsequently mooted by events. Nonetheless, the Court formally **denies** each of the above motions.

Most of the motions are repetitive and repeat the defendant's core objections to the proceeding. They deserve no discussion with the exception of one motion: defendant's *pro se* Motion for Recusal

of Judge [283].  In that motion, the defendant makes assertions that are plainly false.  One allegation, in particular, deserves a reply. In paragraphs 20-22, defendant purports to describe an incident at the conclusion of the colloquy in lock-up that never occurred.  He states:

> 20.  Fact: After the stenographer shut down the gear, Mrs. Carnes, off the record, with a smile told the affiant, I don't know why you're doing all of this, I don't know why you're resisting us cause we're going to get you anyway.
>
> 21.  Fact: The stenographer, U.S. Attorneys, and Mr. Spencer was present and all laughed at Mrs. Carnes' comment.
>
> 22.  Fact: On her way out of the cell, Mrs. Carnes, (again off the record) told the affiant, You see, it's the ones like you that I hate the most.

(Internal quotation marks omitted).  None of the above statements are true as to the attorneys, the court reporter, or "Mrs. Carnes," who was not tarrying to further converse with the defendant and who certainly had no smile on her face.

### III. <u>OTHER MOTIONS</u>

The Government has filed a Motion for Preliminary Order of Forfeiture [299].  The Court **GRANTS** that motion and has entered a separate order as to that motion.

Defense counsel filed a Motion for a Competency Hearing [307] on March 25, 2013.  This was a month after the hearing at which the Court provisionally imposed sentence and was the date that had been set as the deadline for the defendant *pro se* to submit any comments he wanted to make in mitigation of his sentence, before the Court

53

formalized its Judgment. In that motion, defense counsel stated that he had not had direct or indirect contact with the defendant. He had spoken to a different client who is confined at the same facility as the defendant, the United States Penitentiary in Atlanta. That client stated that the defendant "seemed crazy," to him.

In addition, counsel informed the Court that a childhood friend of the defendant had reported to counsel that, presumably some time after the sentencing hearing, she had visited the defendant, who stated that he is on two medications, one of which is an antipsychotic medication used to treat schizophrenia and bipolar disorder and one of which is used to treat depression and anxiety. She further stated that defendant believes that the Government and defense counsel were conspiring to kill him and that someone has been tampering with his food. This friend believes that the defendant has mental health issues.

Given this information, defense counsel requested a hearing to determine whether the defendant was mentally competent at the time of sentencing. The Court appreciates counsel's solicitude, particularly given the disrespectful and ungrateful way in which his client, the defendant, has treated him. Nevertheless, the Court is not inclined, based on this showing, to convene a competency hearing. The defendant has, in the past, admitted that he intended to act like a lunatic to manipulate the proceedings and to throw a monkey wrench into the Court's ability to try him. In those taped conversations

admitting this plan, the defendant seemed to be quite lucid. Any statements he has made to a childhood friend or any behavior that he is exhibiting may be a further effort to manipulate the court system. There was certainly no question that the defendant was competent at the time of his trial, and his *pro se* motions prior to sentencing suggest that this level of competency remained.

The defendant is presently at a facility with psychiatric care, and the BOP is in the best position to gauge the defendant's mental functioning. That defendant is taking the above medications is not necessarily a bad thing. The defendant will, of course, be able to appeal this conviction. After an appeal, he will have a right to file a § 2255 motion to raise any issues not cognizable in the appeal. Should defendant establish a stronger foundation for questioning his competency at sentencing, one of the pleadings can serve as a vehicle for this argument. If defendant was truly not competent at the time of sentencing, and thus could not voluntarily waive his appearance, it will be easy enough to resentence him once that is established. For now, the Court does not wish to further delay finalizing the judgment in this protracted and time-consuming case by initiating any further new proceedings.

Accordingly, the Court **DENIES** defense counsel's motion for a competency hearing [307].

<u>**CONCLUSION**</u>

For the above reasons, defendant's Motion for a New Trial, or,

55

in the Alternative, for Judgment of Acquittal [190] is **DENIED,** as are all other pending motions except for the Government's Motion for Preliminary Order of Forfeiture [299], which is **GRANTED**.

SO ORDERED, this 23rd day of JULY, 2013.

/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

56