# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JEAN-DANIEL PERKINS, | : | MOTION TO VACATE |
| Movant, | : | 28 U.S.C. § 2255 |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:10-CR-00097-AT-LTW-1 |
| | : | |
| UNITED STATES OF AMERICA, | : | CIVIL ACTION NO. |
| Respondent. | : | 1:16-CV-04545-AT-LTW |

## FINAL REPORT AND RECOMMENDATION

Movant Jean-Daniel Perkins, confined at Federal Correctional Institution Edgefield in Edgefield, South Carolina, filed a motion to vacate pursuant to 28 U.S.C. § 2255. (Doc. 359.)  For the reasons that follow, it is **RECOMMENDED** that the instant motion to vacate (Doc. 359) be **DENIED**.

## I.   BACKGROUND

In 2010, Movant was charged with two counts of bank fraud conspiracy, in violation of 18 U.S.C. § 1349; thirty counts of bank fraud, in violation of 18 U.S.C. §§ 1344, 2; four counts of access device fraud, in violation of 18 U.S.C. §§ 1029, 2; and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A, 2. (Doc. 35.)  These charges arose from a "complex credit card fraud scheme that Mr. Perkins operated for approximately 14 months.  Mr. Perkins completed thousands

of fraudulent transactions that netted more than $4 million in ill-gotten gains."
*United States v. Perkins*, 787 F.3d 1329, 1333 (11th Cir. 2015).

Shortly after his arrest for these charges, Movant appeared before the undersigned, during which Movant indicated that he was unable to afford an attorney and wished to have one appointed for him:

> [The Court:] It is my understanding that you would like for the court to appoint someone to represent you and that you are not able to afford an attorney; is that correct?
>
> The Defendant: Yes, ma'am.
>
> The Court: Okay.  To that extent you have completed a financial affidavit, do you either swear or affirm that the information provided in the affidavit is true to the best of your knowledge?
>
> The Defendant: Yes, ma'am.

(Doc. 335 at 3.)  This hearing was routine and otherwise unremarkable; Movant, for example, answered "Yes, ma'am" to the undersigned's questions without elaboration.  (*See id.* at 2-6.)  The Court appointed Derek H. Jones as counsel for Movant.  (Doc. 7.)

A few months later, counsel moved to withdraw.  (Doc. 61.)  On August 31, 2010, the undersigned held a hearing on Jones's motion to withdraw and concluded that the attorney-client relationship had been severed.  (Doc. 336-2.)  The Court then appointed Gary Spencer as counsel for Movant.  (Doc. 66.)  In January 2011, Movant filed a document titled "Revocat[i]on of Power of Attorney," in which

Movant sought to "revoke, cancel, and annul" Spencer's representation.  (Doc. 91.)

In May 2011, Spencer moved to withdraw, explaining that "Mr. Perkins has made it

clear that he does not want the undersigned as counsel.  Moreover, upon information

and belief, Mr. Perkins *never* wanted counsel appointed to him under the Criminal

Justice Act."  (Doc. 139 at 1.)

Magistrate Judge Gerrilyn G. Brill held a hearing on Spencer's motion to

withdraw.  (Doc. 151.)  At the hearing, Movant stated:

> I have never accepted any extraordinary benefits or any benefits whatsoever from this court.  Any representation, any of your esquires, attorneys or barristers or counselors or whatever you want to call it, I have never accepted the benefits as they are under the Criminal Justice Act of 1964.
>
> I am not an indigent, a ward.  I don't accept anything from this court, period, and I do not intend, I do not agree to do business with this court in any way, form or fashion and I never have.  I never have agreed to do business with this court.

(*Id.* at 2-3.)  Movant also continually made statements to the Court such as, "I do

not accept your offer," "Do you have a claim against me?" and "Are you a trustee?"

(*Id.* at 2-6.)  After much discussion with Movant, the Court asked whether Movant

wished to waive his right to counsel.  (*Id.* at 6.)  Movant refused to give a responsive

answer, and the Court denied Spencer's motion to withdraw.  (*Id.*)

A few weeks later, in June 2011, Spencer filed a second motion to withdraw,

including an affidavit from Movant directing Spencer to cease and desist from

representing Movant.  (Docs. 150; 150-1.)  On June 16, 2011, District Judge Julie

E. Carnes held a pretrial conference and another hearing on the issue of appointed counsel, as well as various pro se filings submitted by Movant.  (Doc. 253.)  At the hearing, Movant refused to acknowledge the Court, repeating throughout, "I do not accept your offer."  (*See id.* at 24-32.)  Movant also continually asked for the judge's name and whether the Court had a "contract" with Movant for him to stand trial or any "proof of claim" against Movant.  (*Id.* at 25-32.)

Eventually, Movant told the Court: "For and on the record, I do not accept counsel.  I do not accept anyone representing—to represent. I never did."  (*Id.* at 32.)  The Court, however, determined that Movant's refusal to engage with the Court and his attempts to talk over the judge were a common tactic "obviously designed to disrupt and obstruct the federal proceeding."  (*Id.* at 36.)  The Court further explained, "This is definitely studied, definitely contrived, definitely manipulative. So, I don't see any reason to send this defendant off for a competency examination." (*Id.* at 37.)  The Court concluded that Movant had not made an intelligent waiver of his right to counsel and that Spencer should continue to represent Movant.  (*Id.* at 35-36, 41.)  The Court then discussed arrangements for Movant to view the trial outside of the courtroom in case he tried disrupting the proceedings.  (*Id.* at 43-49.) At one point, an attorney for the Government observed that Movant was engaged in the same tactics that a defendant in another case had tried, and noted that "this [tactic] is jailhouse pick up.  You'll hear from the tapes he was not this way at all up

4

until the day of his arrest.  So, it's a new religion he found while in jail." (*Id.* at 46.)

On June 20, 2011, the morning of the trial, a deputy marshal told Judge Carnes that Movant was refusing to go to court for his trial. (Doc. 236 at 2.)  The Court discussed with counsel and the deputy marshal plans to have Movant view the proceedings through an audio and video feed.  (*Id.* at 5-10.)  After talking with Movant again, the deputy marshal told the Court that Movant continued to refuse to come into the courtroom, telling the deputy marshal that "you are going to have to beat me and it will be kicking and screaming to go into that courtroom." (*Id.* at 26.) The district judge, along with the attorneys and a court reporter, decided to go into the interview room of the holding area to meet with Movant.  (*Id.* at 28-38.)

When the Court tried to explain Movant's rights, Movant continually talked over the Court, repeatedly exclaiming, "I do not understand," "I do not agree," and "I am here against my will." (*Id.* at 39-45.)  The Court proceeded with the trial without Movant in the courtroom, but gave Movant an opportunity to come into the courtroom at any time.  (*Id.* at 47.)  "Mr. Perkins never entered the courtroom, but his lawyer attended the trial.  The district court gave Mr. Perkins opportunities to talk with his lawyer throughout the trial." *Perkins*, 787 F.3d at 1336; (*see* Doc. 237 at 13-14, 22.)

On the second day of trial, Movant again refused to enter the courtroom, and the Court continued to make arrangements for Movant to view the trial remotely.

(Doc. 237 at 3-6.)  With respect to Movant's actions, the Court noted:

> If it's the first time you have heard it, you think this person is a raving lunatic.  But if you have heard it a zillion times as we have all heard it, it has become sort of de rigueur for fraud defendants, when they get in jail, to start filing all these papers that they are free living, breathing, UCC [Uniform Commercial Code], people of the soil, you know, all the verbiage that we know.  They don't accept the offer, they reject the claim over and over again.
>
> To my mind, I have no concerns about this defendant's competency.  I view this as manipulative.  I believe the evidence, when it comes in, is going to show that he was quite clever at figuring out how to obtain millions of dollars from different people.  So I have absolutely no concern about his competency in any way and I think the record in many ways will show that this has been nothing but manipulative behavior on his part.

(*Id.* at 20.)  Movant repeated his refusals to attend court on the following days of trial.  (*See* Doc. 238 at 4-8; Doc. 239 at 3-4.)

Before and during trial, numerous jailhouse phone calls involving Movant were recorded.  (Doc. 309.)  These calls are voluminous—the transcripts of these calls span well over a hundred pages—and only some of these calls will be recounted here.  Many of these calls show that Movant sought to conduct or have others conduct legal research on how to stop his trial from moving forward.  For example, in one call, Movant discussed with his mother the legal definition of "presence" and realized that if he acted like a lunatic who was "plumb nuts" and "just [went] crazy on that mother fucker," (Doc. 309-1 at 26), he would not be considered "present" for his trial.  (*Id.* at 21-26.)  In another call, Movant further

6

discussed with his mother the definition of "presence" under Rule 43 of the Federal Rules of Criminal Procedure as well as several court cases, including *Crosby v. United States*, 506 U.S. 255 (1993).  (*Id.* at 107-10.)  In yet another call, Movant gave advice to a person to do what he did: "We go to the thing and they ask for your name and all that, you don't know shit.  Just keep saying, I don't understand. (Laughing).  You hear me?" (*Id.* at 40.)  Movant also told his mother that

> I went cold turkey on them bitches this morning. . . . I didn't even go out there.  They were saying…the judge kept sending people up there trying to beg for…trying to beg me to come down there and talk to…to…talk on the record.  You hear me? . . . So I kept on saying…and it was recorded and I kept saying it loud, talking over.  I kept saying, I do not understand.  I don't agree.  I do not understand.  I do not understand.  I do not understand.  I do not understand.  I don't agree.  I don't agree.  I do not…you know what I'm saying? . . . I'm like, I do not agree to be here.  I'm here against my will.  I'm here against my will.  I was right there in the microphone.  You feel me?

(*Id.* at 65-66 (some ellipses in original).)

On June 28, 2011, the jury convicted Movant of all counts.  (Docs. 171, 178.)

After conviction, Movant filed a motion for a new trial, arguing that the Court violated Rule 43 of the Federal Rules of Criminal Procedure because Movant was not present at trial.  (Doc. 190.)  In a lengthy order, the Court denied the motion, ruling that Movant had not shown any violation of Rule 43 because trial had begun in Movant's presence when the judge and counsel met with Movant in his holding cell, and that, in any event, Movant had invited any possible error.  (Doc. 313.)  The

7

Court also denied Movant's motion for recusal of the district judge.  (Docs. 283; 313 at 52-53.)

On February 25, 2013, Movant refused to attend his sentencing hearing, but he was once again provided with a live feed of the proceeding.  (Docs. 302, 326 at 2-19.)  Due to Movant's refusal to meet with his counsel or otherwise appear in the courtroom, the Court gave Movant several weeks after pronouncing a provisional sentence to review the presentence report and make any objections, and the Court ultimately sentenced Movant to a total of 360 months of imprisonment on July 17, 2013.  (Docs. 302, 311; Doc. 326 at 61-62.)

After the sentencing hearing, Movant's counsel filed a motion for a competency hearing, explaining that another client of counsel's told counsel that he thought Movant "seemed crazy" and that a childhood acquaintance of Movant told counsel that she believed that Movant, who was taking antipsychotic medications, had mental health issues.  (Doc. 307.)  The Court denied the motion, ruling that "[t]here was certainly no question that the defendant was competent at the time of his trial" and questioning whether any statements made after trial but before sentencing constituted further attempts to manipulate the court system.  (Doc. 313 at 54-55.)

On appeal, Movant, through new counsel, raised eight issues:

1.      the district court erred in forcing appointed counsel on Movant;

2.    the district court erred in denying several motions to suppress evidence;

3.    the district court erred in denying Movant's motion to recuse;

4.    the district court erred in holding a trial in Movant's absence;

5.    the district court violated Movant's right to a public trial;

6.    the Government failed to present sufficient evidence to convict Movant;

7.    the district court erred in sentencing Movant to a term of 360 months; and

8.    the district court erred in not ordering a competency hearing.

Brief of Appellant at 11, *United States v. Perkins*, 787 F.3d 1329 (11th Cir. 2015) (No. 13-13444), 2014 WL 2434234, at *1.

The Eleventh Circuit affirmed. *United States v. Perkins*, 787 F.3d 1329 (11th Cir. 2015). The appellate court ruled that Movant had invited any error that the district court might have committed, concluding:

> We find no readily apparent reversible error in the district judge's decision to deny Mr. Perkins's request to remove his court-appointed counsel, or in her decision to conduct the trial without Mr. Perkins in the courtroom, but we do not pause long to consider these issues because we find that Mr. Perkins invited any error that the district court may have committed.

*Id.* at 1339.

The Eleventh Circuit further ruled that the district court did not abuse its

discretion in refusing to order a competency hearing before trial. *Id.* The appellate court observed that the district judge found that Movant's "disruptive behavior was the product of a competent, calculating mind" at numerous stages of the proceeding, and further noted Movant's jailhouse calls in which he "carefully studied the Federal Rules of Criminal Procedure and then developed tactics to avoid trial." *Id.* at 1340. According to the Eleventh Circuit, "[t]he record confirms that Mr. Perkins planned and executed a strategy to stymie the district court proceedings by saying things that sounded crazy, much like he designed and executed the extensive fraud scheme that brought him before the district court." *Id.* Finally, as relevant here, the Eleventh Circuit concluded that the district court did not abuse its discretion in denying Movant's motion for recusal. *Id.* at 1343.

In 2016, Movant filed the instant motion to vacate pursuant to 28 U.S.C. § 2255, raising five claims:

1.   Movant's procedural and substantive due process rights were violated when the trial and appellate courts determined that Movant was competent without a hearing;

2.   Trial counsel was ineffective for failing to request a mental health evaluation of Movant before, during, or after trial and before sentencing;

3.   Movant's right to a public trial was violated when the court held a

proceeding in the lockup area and later designated that meeting the

beginning of trial;

4.       Trial counsel was ineffective for failing to object to a closed

proceeding in the lockup area, in violation of Movant's right to a public

trial; and

5.       Trial counsel was ineffective for failing to move for recusal of the

district court judge before, during, or after trial and before sentencing.

(Doc. 359.)   Upon review of the § 2255 motion, the Court determined that an

evidentiary hearing on Claim 2 would be beneficial.

At the hearing, Movant presented a number of witnesses.  Dr. Amanda Eberle,

formerly a psychologist with the Bureau of Prisons (BOP), testified that she began

seeing Movant regularly starting in August 2013 when he was transferred to the

BOP prison in Edgefield, South Carolina.  (Doc. 414 at 8-9, 11.)  Dr. Eberle saw

Movant for nearly four years, until March 2017.  (*Id.* at 21.)  In November 2013, Dr.

Eberle met with Movant. (*Id.* at 11-12.)  During that meeting, Movant told Dr.

Eberle that he wanted to see what was inside his head because, when he was a child

living in a boys' home, he had a device implanted in his head that could monitor his

thoughts and actions.  (*Id.* at 12-13.)  Dr. Eberle believed that these thoughts were

clinically delusional.  (*Id.* at 13.)  However, Dr. Eberle did not diagnose Movant

with schizophrenia until May 2014.  (*Id.* at 14.)  During his time at Edgefield,

11

Movant was prescribed Risperdal, an antipsychotic, and Prozac, an antidepressant medication. (*Id.* at 17.)   Movant varied in his compliance in taking those medications and sometimes would go months without taking his medications. (*Id.*) Movant was classified as a level two patient, and Dr. Eberle saw him once a month. (*Id.* at 30-31.)

Dr. Eberle did not believe Movant was malingering, and she did not test for malingering.   (*Id.* at 18-19.)   Dr. Eberle testified that although Movant had delusional beliefs, a person with delusional beliefs can still make volitional choices in areas that are not related to the delusional beliefs.   (*Id.* at 20.)   During her four years of treating Movant, Dr. Eberle did not change her diagnosis of Movant's having schizophrenia because Movant was very consistent in his delusional beliefs. (*Id.* at 21.)  Dr. Eberle noted that Movant's delusions would trigger when things did not go his way.  (*Id.* at 27.)

Dr. Eberle was not responsible for determining competency, and she had no opinion on whether Movant was competent to stand trial in 2011, several years before she began treating him.   (*Id.* at 29.)   Furthermore, Dr. Eberle did not document any delusions by Movant from September 2014 to September 2016, and her notes reflected that Movant adjusted extremely well to the facility.  (*Id.* at 33.)

Dr. Nancy Strauch, formerly a BOP psychiatrist at the Robert A. Deyton Detention Center ("RAD"), testified that she saw inmates at RAD who were referred

to her for mental health screening. (*Id.* at 45-46.) Dr. Strauch saw Movant on March 17, 2010, for a psychiatric evaluation. (*Id.* at 51-52.) Dr. Strauch typically was allotted approximately 30 minutes per patient, including administrative work. (*Id.* at 52.) According to her clinical notes, Dr. Strauch explained that Movant had previously been treated with Prozac, Effexor, and Risperdal. (*Id.* at 54.) Based on Movant's self-reports, Dr. Strauch diagnosed Movant with substance-induced delusional disorder. (*Id.* at 54-55.) Dr. Strauch did not prescribe any medication because it appeared to be unnecessary. (*Id.* at 55.) Aside from the one meeting, Dr. Strauch never saw Movant again. (*Id.* at 56.) Dr. Strauch did not have concerns about malingering, and she did not perform a competency evaluation of Movant. (*Id.* at 59-60.)

Derek Jones, Movant's first counsel, testified that he represented Movant from March 2010 to August 2010 and met with Movant eight or nine times over a total of over ten hours. (*Id.* at 63.) Movant was a difficult client, but Jones did not consider that unusual. (*Id.*) In June 2010, Jones received a presentence report (PSR) from Movant's 1999 conviction in Louisiana. (*Id.* at 64.) Although the PSR contained a reference to Movant's mental health history, including a diagnosis of schizoaffective disorder and prescriptions for Risperdal and Effexor, Jones was not concerned about Movant's mental health. (*Id.* at 64-65.) An intern at Jones's office interviewed Movant's family members regarding Movant's mental health and

13

received information from Movant's mother that Movant had schizophrenia, but Jones did not request medical records related to Movant's mental health. (*Id.* at 65-67.) Jones also did not request a competency hearing because he did not believe there was a competency issue, as Movant appeared competent to him. (*Id.* at 67-68.) Jones never saw any evidence that Movant was hearing voices, nor did Movant ever discuss the idea that a chip had been implanted in his brain or appear to be out of touch with reality. (*Id.* at 74-75.) Jones, who had been practicing for over 40 years, testified that he would have filed a competency motion if he had any reason to believe that Movant's competency was in doubt. (*Id.* at 76.)

Based on his meetings with Movant, Jones believed that Movant was an intelligent man who understood the charges he was facing, Jones's role as Movant's counsel, and the role of the undersigned and the district judge in his case. (*Id.* at 72-73.) Movant also understood Jones's statements on possible legal defenses. (*Id.* at 73.) Movant did not refuse to participate in those discussions, nor did he refuse to consent to talking to Jones. (*Id.* at 73-74.) Jones believed that, based on Movant's desire for Jones to make certain motions, Movant understood the criminal justice process very well. (*Id.* at 74.)

Gary Spencer, Movant's second counsel, testified that he was appointed as Movant's counsel after Jones withdrew from the case. (*Id.* at 78.) During Spencer's representation, Movant sought to raise a sovereign citizen defense, believing that he

14

was not under the jurisdiction of the federal courts.  (*Id.*)  Movant also believed that, because Spencer was appointed by the Court, Spencer was part of the federal court system.  (*Id.*)  Spencer did not request any mental health records for Movant but believed that he should have, as he learned following his receipt of the PSR for this case that Movant had prior mental health issues.  (*Id.* at 79-80.)  Spencer filed a motion for a competency evaluation after sentencing because he believed Movant was unable to consult with Spencer regarding his trial and defense.  (*Id.* at 84-85.)

Before and during trial, Movant refused to consult with Spencer regarding the case.  (*Id.* at 82-83.)  However, Spencer did not believe that Movant did not understand the charges he was facing, Spencer's role as defense counsel, the role of the judge in his case, or any possible defenses or strategies discussed by Spencer. (*Id.* at 86-87.)  Instead, Spencer believed that, as a sovereign citizen, Movant simply refused to cooperate with Spencer.  (*Id.* at 87.)  Spencer further believed that, based on Judge Carnes's statement that Movant's conduct was studied, contrived, and manipulative, a competency motion would have been futile.  (*Id.* at 89.)  In addition, until Spencer received information from the 1999 PSR and from Movant's acquaintance and a fellow inmate regarding Movant's mental health, Spencer did not have any concerns about Movant's competency, as he believed that Movant was able to assist his attorney in the case and understand the proceedings against him. (*Id.* at 89-91.)  Spencer filed the competency motion to alert the Court as to any

possible issue even though it was based on "rank hearsay" "gleaned over the telephone" and not from a doctor.  (*Id.* at 92.)

Dr. Adriana Flores, an expert witness in clinical and forensic psychology, testified that, in her opinion, Movant was not competent to stand trial.  (*Id.* at 103, 111.)  Dr. Flores's opinion was based on her evaluation of Movant as well as a review of Movant's medical records and records from Movant's criminal case.  (*Id.* at 109-11.)  Dr. Flores met with Movant twice in September 2019 for a total of four hours.  (*Id.* at 111; *see* Def.'s Ex. 5 at 2.)

According to Dr. Flores, during her 2019 evaluation of Movant, he displayed disjointed and paranoid thoughts.  (Doc. 414 at 112.)  For example, Movant told Dr. Flores that her cough was produced by the government, and he talked about the government's use of chem trails as a way to affect people.  (*Id.*)  Dr. Flores also noted that Movant displayed disjointed thoughts during his jailhouse calls when, for example, he told his mother that he was a king.  (*Id.* at 114.)  Dr. Flores further noted that Movant's paranoid ideations prevented him from being able to assist his counsel, and the stress of trial exacerbated his delusions.  (*Id.* at 115-16, 138.) However, these symptoms receded after Movant entered the BOP because he entered a stable and structured environment.  (*Id.* at 116.)  Dr. Flores acknowledged that competency is fluid, and a person could be competent at one point in time and not at another point.  (*Id.* at 116-17.)  Dr. Flores also explained that Movant's delusional symptoms

would not necessarily appear unless they were triggered, such that Movant could appear to be normal.  (*Id.* at 120-21.)  During her second session with Movant, Dr. Flores noted that Movant had auditory hallucinations.  (*Id.* at 134-35.)

Dr. Flores tested for malingering and did not detect any malingering from Movant based on the results of the Miller Forensic Assessment of Symptoms Test (M-FAST) and Movant's responses.  (*Id.* at 110-11, 124-26, 138-40.)  According to Dr. Flores, any malingering in the present would suggest malingering in the past. (*Id.* at 140.)  However, Dr. Flores explained that the M-FAST was a screening test and would not be able to detect more subtle forms of malingering.  (*Id.* at 197-98.)

Dr. Flores admitted that she is not board certified, and that out of over twenty cases from November 2015 to November 2019, she had testified only for the defense.  (*Id.* at 145-47.)  Dr. Flores explained that Movant understood the court process, including the nature of the charges against him, but was unable to assist counsel.  (*Id.* at 152-54.)  However, shortly thereafter, Dr. Flores then explained that Movant was actually not able to understand the consequences of the proceedings against him because he believed the charges and proceedings were a conspiracy against him.  (*Id.* at 155-57, 213.)  Dr. Flores also admitted that she failed to discuss an evaluation of Movant performed at the Robert A. Deyton Detention Facility ("RAD") the second day of trial in which Movant was screened for psychiatric symptoms and was described as being organized, logical, and social.  (*Id.* at 172-

75; *see* Gov's Ex. 2.)  Dr. Flores testified that she provided a consent form to Movant for her evaluation of him, which provided that the evaluation could be used in a legal proceeding, and that Movant understood the form.  (Doc. 414 at 191-93; *see* Gov.'s Ex. 3.)

The Government presented two witnesses.  Dr. Courtney Tibbetts, a former BOP psychologist, testified that she treated Movant at Federal Correctional Complex Oakdale in Oakdale, Louisiana, starting in May 2017.  (Doc. 414 at 218-21, 236.)  Dr. Tibbetts evaluated Movant shortly after he sent an email to the psychology services inbox indicating that he was distressed at being placed at Oakdale.  (*Id.* at 221.)  Dr. Tibbetts was concerned about Movant because the email appeared to be tangential and disorganized.  (*Id.* at 222.)  For her diagnostic and care level formulation for Movant, Dr. Tibbetts reviewed Movant's prior medical records and noticed that, although Movant had been diagnosed with schizophrenia, there were inconsistent reports of symptoms, and the symptoms were largely self-reported.  (*Id.* at 220, 222; *see* Gov's Ex. 9 at 19-21 (Diagnostic and Care Level Formulation dated May 4, 2017).)  Dr. Tibbets also noticed that the symptoms occurred in close proximity to a goal-oriented behavior.  (Doc. 414 at 224.)  Dr. Tibbetts further observed that, although Movant had been prescribed Risperdal and was largely noncompliant with his medication, there were very few reports of psychotic symptoms.  (*Id.* at 223.)  In reviewing Movant's PSR, Dr. Tibbetts noted

that Movant had been engaged in an organized and sophisticated fraud scheme that would not have been typical of a person with schizophrenia. (*Id.* at 224-25.) Dr. Tibbetts also believed Movant's phone calls indicated that Movant's symptoms were calculated and that Movant was aware of a potential gain in the emergence of his symptoms. (*Id.* at 225.)

Dr. Tibbetts noticed during her evaluation of Movant that Movant may have displayed some delusional thoughts because he believed that he had been tricked into transferring to Oakdale. (*Id.* at 226-27.) However, Movant became calmer when Dr. Tibbetts discussed the issue with him, which was inconsistent with a delusional belief because it did not persist. (*Id.* at 226-27.) During a follow-up the next week, Movant did not report any psychotic symptoms to Dr. Tibbetts. (*Id.* at 227.) Although Dr. Tibbetts did not believe Movant had schizophrenia, she did not change Movant's diagnosis or care level so that she could have additional observation. (*Id.* at 228.) Movant did not note any delusional beliefs in subsequent visits. (*Id.* at 229.)

During his time at Oakdale, Movant told Dr. Tibbetts that he was working on a cell phone social networking app. (*Id.* at 230.) Dr. Tibbetts was concerned that the app could have been a delusion, but she was able to verify that the app was real. (*Id.* at 230-31, 241-42.) Furthermore, Dr. Tibbetts did not receive any complaints from other inmates regarding Movant. (*Id.* at 231.)

19

Dr. Tibbetts performed another diagnostic and care level formulation in December 2017. (*Id.* at 231-32; *see* Gov's Ex. 9 at 2-4 (Diagnostic and Care Level Formulation dated Dec. 28, 2017).) In this report, Dr. Tibbetts noted that she did not observe any impairment in functioning with Movant and determined that Movant did not meet the criteria for schizophrenia. (Doc. 414 at 233.) Accordingly, Dr. Tibbetts removed Movant's schizophrenia diagnosis and decreased his care level to care level one, indicating that no intervention was needed. (*Id.* at 233-34.) Dr. Tibbetts did not determine whether Movant was malingering because she considered it to be a very "damning" diagnosis that was not within her normal duties of providing treatment to inmates. (*Id.* at 233-34, 254.) However, Dr. Tibbetts did not see any delusional or psychotic symptoms during the time she treated Movant, and she believed that Movant was highly intelligent, motivated, and organized. (*Id.* at 234.) Although Dr. Tibbetts acknowledged that a person with delusions could function normally, she did not believe that to be the case with Movant because he did not have any symptoms for such a long period of time. (*Id.* at 251-52.)

Finally, Dr. Michael Vitacco, an expert witness in forensic psychology, testified that, in his opinion, Movant was competent to stand trial. (*Id.* at 263, 266-67.) Dr. Vitacco based his opinion on a review of documents from various court proceedings, the audio recordings and transcripts of Movant's jailhouse phone calls, Movant's medical records from the BOP, the PSR in Movant's case, and Dr. Flores's

report.   (*Id.* at 263-64.)   Dr. Vitacco is a board-certified psychologist, which represents the highest level of competency in psychology.   (*Id.* at 260.)   He explained that there was a significant difference between a mental health diagnosis such as schizophrenia versus a competency evaluation, and it is very common for individuals with schizophrenia to be competent to stand trial.   (*Id.* at 266.)

Dr. Vitacco did not personally meet with Movant as part of his evaluation, but he explained that there was no need to personally interview Movant because he was asked to conduct a retrospective evaluation rather than an evaluation of Movant's current competency.   (*Id.* at 264-65.)   Furthermore, he explained that a personal interview could actually be unhelpful because it could result in extraneous information that would not be relevant to determining whether Movant was competent in 2011.   (*Id.* at 265.)

Dr. Vitacco testified that, in determining that Movant was competent to stand trial in 2011, he relied on, among other things, Movant's criminal history, which was extensive and showed that Movant had previously successfully worked with attorneys in his prior charges.   (*Id.* at 268-69.)   Furthermore, Dr. Vitacco believed that it was extremely unlikely that a person would be able to engage in the type of complex fraud that Movant engaged in while having the type of significant delusional ideations that Movant reported.   (*Id.* at 270-71.)

Dr. Vitacco noted that the RAD medical records from 2010 and 2011 did not conclusively show that Movant had a mental health diagnosis, and they did not discuss competency at all.  (*Id.* at 273.)  Dr. Vitacco further noted that Movant indicated drug use in these records, which was unusual because drug use was not corroborated in any other records.  (*Id.* at 274.)  Dr. Vitacco also testified that it would be highly unlikely and not consistent with a genuine mental illness for a person to have a psychotic episode during court and then have no symptoms later that evening, as documented by the RAD records from Movant's second day of trial.  (*Id.* at 275.)  Similarly, Dr. Vitacco explained that it was very unusual that Movant did not experience any increase in symptoms despite being noncompliant with his medications.  (*Id.* at 277-78.)  Dr. Vitacco also noted that, after Movant left Edgefield, Movant's physicians and psychologists at other institutions—Atlanta, Oklahoma City, and Oakdale—did not report any delusional beliefs.  (*Id.* at 278.)  Dr. Vitacco explained that delusional beliefs do not often need to be "tapped," yet, for example, many years passed by without any description or discussion of Movant's belief that he had a chip in his head.  (*Id.* at 280.)

Dr. Vitacco further observed that, although Dr. Flores noted significant symptoms of disorganization during her interviews with Movant, these symptoms ran counter to Movant's recent psychiatric history, as Movant has not had any

problems with staff or other inmates while at Oakdale and has not seen any psychiatric services at all since the end of 2017.  (*Id.* at 281.)

Dr. Vitacco also reviewed several of the jailhouse calls Movant made while at RAD.  (*Id.* at 282-86.)  Dr. Vitacco observed that, in one call, Movant noted that his trial would start on Monday, which showed that Movant had the ability to recognize that there was an important proceeding against him in which he needed to participate.  (*Id.* at 287; *see* Doc. 309-1 at 21 *et seq.*; Gov.'s Ex. 7-1, June 17, 2011 clip.[1])  Dr. Vitacco explained that Movant's discussion of the legal definition of "presence" showed that Movant knew that he needed to do something to deal with his trial.  (Doc. 414 at 287.)  Dr. Vitacco further found remarkable that Movant did not espouse any antigovernment themes or otherwise reveal any delusional ideations during his preparation for trial.  (*Id.* at 287-88.)

Later in that call, Dr. Vitacco noted that Movant, in directing his mother to conduct legal research on his behalf, distinguished between colloquial and legal definitions of "presence," showing that he was aware of the legal proceedings.  (*Id.* at 288.)   Movant's discussion of his attorney also showed that he consciously decided not to work with his attorney.  (*Id.*)  Dr. Vitacco further observed that Movant's discussion of staying silent versus going "plumb nuts" and not engaging

---

[1] At the hearing, the Government filed a CD containing several clips of audio recordings of Movant's phone calls.

with the Court showed that Movant was formulating his defense strategy and weighing different options. (*Id.* at 288-89.) According to Dr. Vitacco, in this call, Movant sounded organized, coherent, logical, and goal oriented. (*Id.* at 289.)

With respect to other calls Movant made just before trial, Dr. Vitacco noted that Movant laid out his strategy at trial in deciding not to work with his attorney and further observed that Movant did not discuss a government conspiracy in any of his conversations. (*Id.* at 290-91; *see* Doc. 309-1 at 39 *et seq.*; Gov.'s Ex. 7-1, June 18, 2011 clip.) Finally, in a call after trial started, Dr. Vitacco noted that Movant appeared to be laughing at his acts of implementing his plans to frustrate trial. (Doc. 414 at 292; *see* Doc. 309-1 at 64 *et seq.*; Gov.'s Ex. 7-1, June 20, 2011, first clip.) Dr. Vitacco opined that a person with delusions would not be able to plan and carry out these plans with such remarkable accuracy and consistency. (Doc. 414 at 292.)

Dr. Vitacco explained that he has performed hundreds of competency evaluations; he generally has been hired as an expert by state courts to determine competency; and he has found defendants competent approximately seventy percent of the time, in line with the national average. (*Id.* at 296, 335-36.) Dr. Vitacco previously performed one other retrospective competency evaluation many years ago, and he determined that the person in that case was not competent. (*Id.* at 343.)

Dr. Vitacco admitted that he did not review certain BOP medical records discussing a diagnosis of depressive type psychosis for Movant from 2013 and 2018, but he stated that those records did not change his opinion because they were not relevant to the question of whether Movant was competent to stand trial. (*Id.* at 299.) Dr. Vitacco also admitted that a person could be living in a delusional system and yet be able to make volitional choices, but he believed that there was no evidence that Movant was living in a delusional system. (*Id.* at 311-12.)

Dr. Vitacco believed that Movant's remark that he was a king during one of his phone calls did not indicate a delusion, but instead was a joke or a religious idea. (*Id.* at 318-21.) Dr. Vitacco also believed that Movant's description of the Court's attempts to have him attend trial as a conspiracy did not show that Movant was delusional, but instead was rooted in fact. (*Id.* at 324-25.) Similarly, Dr. Vitacco believed that Movant's refusal to work with his counsel was not the result of a delusion, but instead reflected the common view among defendants that court-appointed attorneys are not trustworthy. (*Id.* at 325-26.)

## II.   DISCUSSION

### A.   *Claim 1*

"It is long settled that a prisoner is procedurally barred from raising arguments in a motion to vacate his sentence that he already raised and that [the appellate court] rejected in his direct appeal." *Stoufflet v. United States*, 757 F.3d

25

1236, 1239 (11th Cir. 2014) (citation and internal quotation marks omitted); *accord United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) ("Once a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255." (brackets and internal quotation marks omitted)).

Movant argues that his due process rights were violated when the trial court and appellate court ignored all evidence of his prior mental health diagnosis and found that his competency at the time of trial and sentencing could be determined without a hearing. (Doc. 359 at 9-17.) Movant, however, may not raise this claim in his § 2255 motion because the Eleventh Circuit already ruled on this claim on direct appeal: "Mr. Perkins argues that the district court should have ordered a competency hearing before his trial began. We disagree." *United States v. Perkins*, 787 F.3d 1329, 1339 (11th Cir. 2015). Thus, because the Eleventh Circuit already ruled on this claim, Movant is precluded from raising it again in a motion to vacate.[2] *See Stoufflet*, 757 F.3d at 1239.

---

[2] Indeed, Movant admits that he raised this claim on appeal. (*See* Doc. 359 at 9 n.2 ("Mr. Perkins raised both claims [of violations of due process] in his direct appeal. The appellate court ignored all evidence of his prior diagnosis and prior prescription for antipsychotic drugs when finding no error on appeal.").) Even if Movant were not barred from raising this claim again in a § 2255 motion, it is axiomatic that this Court has no authority to overrule the Eleventh Circuit.

B.    *Claim 2*

To prevail on a claim of ineffective assistance of counsel, a prisoner must meet a two-part test established by *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that "counsel's performance was deficient." *Khan v. United States*, 928 F.3d 1264, 1272 (11th Cir.), *cert. dismissed*, 140 S. Ct. 339 (2019). Counsel's performance is deficient only if it falls "below an objective standard of reasonableness." *Id.* (internal quotation marks omitted). "There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance, and, therefore, counsel's performance is deficient only if it falls below the wide range of competence demanded of lawyers in criminal cases." *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014). Second, a prisoner must show that he suffered prejudice as a result of counsel's deficient performance. *Id.* To establish prejudice, a prisoner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks omitted).  A court need not address both prongs if a prisoner makes an insufficient showing on one.  *Id.*

Movant contends that counsel were ineffective when they failed to request a mental health evaluation of Movant prior to or during trial or after trial and before sentencing.  (Doc. 359 at 17-19; Doc. 417.)  However, Movant has not shown that

counsel were ineffective before or during trial because he has not shown that their performance was deficient.  The Court stated in no uncertain terms that Movant was competent.   For example, at the pretrial conference, the Court determined that Movant's refusal to engage with the Court and his attempts to talk over the judge were a common tactic "obviously designed to disrupt and obstruct the federal proceeding."  (Doc. 253 at 36.)  The Court further explained, "This is definitely studied, definitely contrived, definitely manipulative.  So, I don't see any reason to send this defendant off for a competency examination."  (*Id.* at 37.)  Similarly, at the second day of trial, the Court stated:

> If it's the first time you have heard it, you think this person is a raving lunatic.  But if you have heard it a zillion times as we have all heard it, it has become sort of de rigueur for fraud defendants, when they get in jail, to start filing all these papers that they are free living, breathing, UCC, people of the soil, you know, all the verbiage that we know.  They don't accept the offer, they reject the claim over and over again.
>
> To my mind, I have no concerns about this defendant's competency.  I view this as manipulative.  I believe the evidence, when it comes in, is going to show that he was quite clever at figuring out how to obtain millions of dollars from different people.  So I have absolutely no concern about his competency in any way and I think the record in many ways will show that this has been nothing but manipulative behavior on his part.

(Doc. 237 at 20.)  The Eleventh Circuit, affirming the Court's determination that Movant was competent, similarly ruled that

> [t]he record confirms that Mr. Perkins planned and executed a strategy to stymie the district court proceedings by saying things that sounded crazy, much like he designed and executed the extensive fraud scheme

that brought him before the district court.  The record reflects that Mr. Perkins was not unable to assist his attorney with his defense; Mr. Perkins simply chose not to participate in his defense.

*Perkins*, 787 F.3d at 1340.  Based on these statements from the Court and the Eleventh Circuit, counsel would not have had any success in filing a competency motion, and "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."  *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994); *accord Freeman v. Attorney Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . .").  Counsel similarly would not have had any success in filing a competency motion after trial and before sentencing given that the Court believed Movant remained competent before sentencing.[3]  (*See* Doc. 313 at 55.)  In any event, counsel acted reasonably in the circumstances.  Both Jones and Spencer testified that they believed Movant was competent, and Spencer immediately filed a competency motion after receiving "rank hearsay" suggesting that Movant had mental health problems.  (*See* Doc. 414 at 76, 86-92.)  Thus, Movant has not shown that counsels' performance was deficient.  *See Khan*, 928 F.3d at 1272; *Osley*, 751 F.3d at 1222.

---

[3] Movant argues that counsel should have uncovered his medical records sooner, which would have resulted in an earlier competency motion, which would have resulted in the Court's finding Movant incompetent.  (Doc. 417 at 8, 29-30.) This argument exceeds the scope of the claim delimited for the evidentiary hearing and, in any event, essentially amounts to nothing more than speculation built upon speculation, which is grossly insufficient to show that counsel was ineffective.

Furthermore, Movant has not shown prejudice, as he has not demonstrated that he was not competent at trial and sentencing. To determine whether a defendant is competent, a court must find "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *United States v. Rodriguez*, 751 F.3d 1244, 1252 (11th Cir. 2014) (internal quotation marks omitted). Standing alone, "evidence of low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of anti-psychotic drugs is not sufficient to show incompetence to stand trial." *Pardo v. Sec'y, Fla. Dep't of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009). Here, as discussed above, both this Court and the Eleventh Circuit determined that Movant was competent. *Perkins*, 787 F.3d at 1340-41; (Doc. 253 at 36, 37; Doc. 237 at 20.)

To the extent that the Court can disturb that determination on collateral review, both the existing record and the evidence adduced at the evidentiary hearing conclusively show that Movant was competent at the time of his trial and sentencing. As discussed several times, Movant made numerous phone calls that show that he understood the court proceedings and sought to delay and interfere with those proceedings. These calls show that Movant developed a plan, weighed various options in carrying out his plan, implemented his plan, and celebrated his success. (*See* Doc. 309-1 at 21-26, 40, 65-66, 107-18.) Movant displayed considerable legal

acumen in directing others to conduct legal research, developing an understanding of the meaning of "presence" under Federal Rule of Criminal Procedure 43, and differentiating between different levels of court precedent.  (*See, e.g.*, *id.* at 114 ("PERKINS: No. No. No he wasn't. Ma, you got to keep going…the Supreme Court….that's the Appellate Court. Now you gotta keep going." (ellipses in original)).)  In short, these calls show that Movant knew exactly what he was doing.

Moreover, both counsel testified that Movant understood the charges against him, the roles of the judge and counsel, and any possible defenses, and they both believed that Movant was competent.  (Doc. 414 at 72-76, 86-92.)  Similarly, both counsel reported that Movant was able to work with them, although Movant subsequently consciously refused to work Spencer.  (Doc. 414 at 72, 74, 78-79, 87.)  Movant even acknowledged in a phone call that he deliberately refused to work with his attorney as part of his plan, stating, "As soon as I rid of the lawyer I put it like…go cold turkey on 'em and them and then like fuck ya'll."  (Doc 309-1 at 39; *see also id.* at 21 ("[O]nce you accept an attorney, it says that you lose the right to speak.").)

Finally, although Dr. Flores opined that Movant was not competent at trial or sentencing, the undersigned finds that Dr. Flores's testimony is entitled to little, if any, weight.  Dr. Flores primarily based her opinion on her personal observations of Movant, yet it is difficult to see how such present observations, conducted in late

31

2019, could reveal whether Movant was competent in 2011, over eight years beforehand. Dr. Flores's conclusion that Movant is incompetent is also at odds with the observations of numerous other doctors. For example, Dr. Flores noted that Movant proclaimed that the government caused her cough when she first met with him in 2019. (Doc. 414 at 112; *see* Def.'s Ex. 5 at 5.) Given Movant's supposed quickness to attribute even a cough to a government conspiracy, it is remarkable that years passed by without any mention of any delusional ideation in Movant's medical records, as documented by Dr. Eberle and others. In particular, Dr. Eberle did not report any psychotic symptoms in a two-year period from September 2014 to September 2016. (Doc. 414 at 33.) Similarly, while regularly seeing Dr. Tibbetts from May to December 2017, Movant had no reports of psychotic problems, nor did he have problems in 2018 onward after being downgraded to care level one in late December 2017. (*See id.* at 220-34; Gov's Ex. 9.) Yet Dr. Flores reported that Movant displayed delusional thoughts immediately upon meeting with her: "From the onset of the first evaluation session, Mr. Perkins demonstrated psychotic symptoms." (Def.'s Ex. 5 at 5.) Such symptoms, dormant for years and yet reappearing precisely at an important evaluation for his motion to vacate, appear to be the kind of goal-oriented behavior about which Dr. Tibbetts had significant concerns. (*See* Doc. 414 at 224 ("So when I was looking at the records, it appeared that whenever there was a self-report in symptoms, it was in close proximity to a

goal-oriented behavior, either a desire to change a condition of confinement or a request for his own medical records, something of that nature.").)   Dr. Flores, however, did not address any concerns that Movant's behavior could have been goal oriented.

More generally, Dr. Flores appeared to place little weight on contemporary accounts suggesting that Movant was competent, such as the jailhouse phone calls and the evaluation of Movant at RAD after the second day of trial.  Indeed, even though the RAD evaluation reflected that Movant's thoughts were logical and organized and Movant did not display any psychiatric issues, (Gov.'s Ex. 2)— despite the fact that Movant earlier that day refused to attend trial and had to be restrained, (Doc. 237 at 3)—Dr. Flores did not even mention the RAD evaluation in her report.  (*See* Doc. 414 at 172-75.)  Furthermore, although Dr. Flores stated that Movant could not understand the consequences of the charges against him because "he could not see a way to be able to beat the conspiracy," (*id.* at 213), Movant was extremely pleased with himself during one jailhouse call because he believed he had found a way to stop the trial against him by refusing to be present for his trial.  (*See* Doc. 309-1 at 65-66; Gov.'s Ex. 7-1, June 20, 2011, first clip.)

At most, based on testimony from psychologists such as Dr. Eberle as opposed to Dr. Tibbetts, Movant has shown that it is debatable whether he suffers from schizophrenia.  But "suffer[ing] from mental illness," *Perkins*, 787 F.3d at

1340, is not the same as being incompetent to stand trial, and Movant has not shown that he was not competent during trial and sentencing. *See Rodriguez*, 751 F.3d at 1252. As a result, Movant has not demonstrated prejudice from any failure to file a competency motion. Accordingly, Movant has not shown that counsel were ineffective with respect to this claim.

C.    Claim 3

Movant contends that his right to a public trial was violated when the Court held a closed proceeding in the marshals' lockup area and later designated that meeting as the beginning of trial. (Doc. 359 at 19-24.) As with Claim 1, however, Movant is precluded from raising this claim in a § 2255 motion because the Eleventh Circuit rejected this claim on direct appeal. Although the Eleventh Circuit did not explicitly reject this claim, it implicitly rejected the claim in affirming the district court's judgment and in "find[ing] no reversible error in the manner in which the district court addressed Mr. Perkins's obstructive tactics." *Perkins*, 787 F.3d at 1345; (*see* Doc. 359 at 19 n.8 ("This issue was objected to by trial counsel prior to sentencing and raised on direct appeal.").)

Moreover, even if Movant were not barred from relitigating this claim, Movant invited any possible error. It was Movant who verbally and physically refused to attend his own trial. And as shown by his phone calls, Movant deliberately planned to obstruct the trial and even boasted of his success:

34

PERKINS: I went cold turkey on them bitches this morning.  You hear me?

MOTHER: Yeah.

PERKINS: I didn't even go out there.  They were saying…the judge kept sending people up there trying to beg for…trying to beg me to come down there and talk to…to…talk on the record.  You hear me?

MOTHER: Yeah.

PERKINS: I was like…I was like, no, fucker.

(Doc. 309-1 at 65 (ellipses in original).)

As the Eleventh Circuit so aptly stated, "There can be no fairness in the administration of criminal procedure if a defendant can turn that procedure on its head." *Perkins*, 787 F.3d at 1338.  Having "invite[d] the trial court to commit error," Movant may not now "cry foul on appeal" or collateral review.  *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009).

D.    *Claim 4*

Movant argues that counsel was ineffective when he failed to object to a closed proceeding in the marshals' lockup area as a violation of Movant's right to a public trial.  (Doc. 359 at 24-27.)  As discussed above, however, Movant invited error and thus cannot show prejudice, as any deficient performance from counsel would not have affected this Court's or the Eleventh Circuit's determination of the claim or otherwise changed the outcome.  Moreover, even if Movant had not invited error, the Eleventh Circuit found "no reversible error in the manner in which the

35

district court addressed Mr. Perkins's obstructive tactics," *Perkins*, 787 F.3d at 1345. Thus, Movant has not shown that counsel was ineffective.

### E.   Claim 5

Finally, Movant asserts that counsel was ineffective when he failed to file a motion for recusal of the district judge prior to, during, or after trial and before sentencing.   (Doc. 359 at 27-30.) Counsel's performance, however, was not deficient, and Movant has not shown prejudice.  The Eleventh Circuit expressly ruled that the district judge was not required to recuse. *Perkins*, 787 F.3d at 1342-43.  Any attempt by counsel to file a meritless motion for recusal of the district judge therefore would not have led to a different result.  *See Osley*, 751 F.3d at 1222. Accordingly, counsel was not ineffective.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . .  If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Section 2253(c)(2) states that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  A substantial showing of the denial of a constitutional right "includes showing that reasonable jurists could debate whether (or, for that matter,

36

agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim . . . a certificate of appealability should issue only when the prisoner shows both that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Jimenez v. Quarterman*, 555 U.S. 113, 118 n.3 (2009) (citing *Slack*, 529 U.S. at 484) (internal quotation marks omitted).

It is **RECOMMENDED** that a certificate of appealability be **DENIED** because resolution of the issues presented is not debatable.  If the district judge assigned to this case adopts this recommendation and denies a certificate of appealability, Movant is advised that he "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." 28 U.S.C. foll. § 2254, Rule 11(a).

## IV.   CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that the instant motion to vacate (Doc. 359) be **DENIED** and that a certificate of appealability be **DENIED**.

The Clerk is **DIRECTED** to terminate the referral to the undersigned.

**SO ORDERED AND RECOMMENDED**, this   13   day of April, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE