IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION NO. |
| *v.* | 1:10-CR-0097-AT |
| JEAN-DANIEL PERKINS | |

### Government's Opposition to Defendant's Motion for Compassionate Release

The United States of America, by Kurt R. Erskine, Acting United States Attorney, and David A. O'Neal, Assistant United States Attorney, for the Northern District of Georgia, file this response in opposition to Defendant's motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).

## Background

### 1. The Offense Conduct

Defendant Jean-Daniel Perkins perpetrated multiple elaborate credit card fraud schemes, completing thousands of fraudulent transactions worth more than $4 million. *United States v. Perkins*, 787 F.3d 1329, 1333 (11th Cir. 2015). Perkins was charged in a federal indictment with two bank fraud conspiracies, 30 counts of substantive bank fraud, four counts of access device fraud, and one count of aggravated identity theft. (Doc. 35).

### A. The American Express Fraud Scheme

Perkins fraudulently charged $3 million from American Express. (PSR, ¶20(a)).  For this scheme, Perkins established over two dozen merchant accounts, which are accounts for businesses who wish to accept American Express cards as

payment. (Docs. 237 at 133-34, 269; 239 at 613, 664, 678). Operating as a merchant, Perkins used stolen and counterfeit American Express card numbers to make fraudulent charges. (Docs. 237 at 269–70; 239 at 601-602, 613, 621-624, 668–679). Following the merchant agreement, American Express would deposit the amounts into Perkins's settlement accounts within days of Perkins entering the charges. (Doc. 239 at 601–602, 613–614, 617, 621-624, 666, 669). By the time customers questioned the fraudulent charges, Perkins had drained the settlement accounts. (Docs. 238 at 305; 239 at 613, 617–618, 666–670).  Perkins's intended loss to American Express exceeded $3 million, with an actual loss over $500,000. (PSR, ¶20(a)).

### B.  The Suntrust Fraud Scheme

Perkins also attempted to defraud Suntrust bank. (PSR,¶20(b); Doc. 239-540). Perkins met at least two Suntrust bank tellers socially, and extracted from them confidential account information, including the names of people authorized to sign withdrawals for high-value Suntrust accounts. (Doc. 238 at 408–427, 444–464). The two insiders identified a picture of Perkins as the person to whom they gave printouts from Suntrust's internal computer system. (Doc. 238 at 319–320, 412, 447, 467; Gov't Exs. 177, 98).

Perkins used the confidential account information to pose as the true accountholders and apply for online account access, allowing him limitless transfers online. (Doc. 238 at 379–383, 386–393, 407). He also used the confidential information to submit bank forms that disabled security measures on the accounts, so that the bank would no longer seek to confirm the accountholder intended the transfers. (Doc. 238 at 383, 389).

The superseding indictment involved three accounts: Cooper & Company, a family-owned construction company; Ferry, Hayes, and Allen, an architectural firm; and the Georgia Tech Foundation, which contained over $10 million. (Docs. 35; 238 at 396–402, 468 at 471; 239 at 586–589, 647–651; Gov't Ex. 98; PSR, ¶31). Perkins successfully transferred over $3.5 million from Cooper & Company. (Doc. 238- 396–402). Fortunately, Gail Cooper, who pays the bills for the company, checks the account daily. (Doc. 238-506, 509). When she saw the large withdrawals, she alerted Suntrust, which was able to reverse the withdrawals. (Doc. 238 at 399–400, 510).  Overall, Perkins obtained confidential information for 47 high-value accounts held by 13 depositors, worth over $20 million. (PSR, ¶20(b)).

### C. Perkins is arrested while trying to gain access to internal bank databases, seeking to defraud banks of $50 million.

The FBI set up an undercover operation in which an FBI agent posed as a consultant with access to internal bank database information. (Doc. 237 at 116-118). The agent was introduced to Perkins, who went by the aliases "Daniel Mathews" and "LJ." (Doc. 237-115–119). The agent and Perkins spoke on the telephone, by email, and by text-message. (Doc. 237 at 119). Once introduced, the agent told Perkins that he could move money using the bank's internal systems, and Perkins told the agent that he could get the money out of the banks. (Doc. 237 at 132–135). Perkins's goal was to steal $50 million. (Doc. 237 at 135). The two consummated a few small trial transactions. (Doc. 237 at 151–154, 164–167).

The agent and Perkins also discussed credit card fraud. (Doc. 237 at 137, 144–147). Perkins told the agent that he had a source for credit card information in

Ukraine. (*Id*). Later, agents found in Perkins's car and apartment receipts for wires to Ukraine. (Doc. 237 at 147, 234–237, 263–265; Gov't Exs. 26-29, 90-92). Internet chat records on a computer Perkins had with him when arrested show Perkins purchasing credit card information from a person in Ukraine, and show information corresponding to a wire receipt found in his apartment. (Doc. 239 at 706, 709–724). A file of stolen Discover card numbers was also found on that computer, and on a thumb drive in Perkins's apartment. (Docs. 238 at 523–525; 239-721–722; Gov't Exs. 153, 154).

Perkins told the agent that he would put the compromised credit card information onto the magnetic strips of blank credit cards using a MSR206 card writer. (Doc. 237 at 172–174). A MSR206 was later found in Perkins's apartment, connected with an old serial-to-USB connection just as Perkins had described to the agent; a manual for a MSR206 was found on a thumb drive in Perkins's pocket on arrest. (Docs. 237 at 172–174, 191, 240–245; 238-525, 539; Gov't Ex.155). Perkins also told the agent that he purchased camera equipment using stolen card numbers. (Doc. 237 at 153). The equipment was later found in Perkins's apartment with receipts showing that it was purchased with stolen Discover cards; those card numbers were found on Perkins's electronic media. (Docs. 237 at 266–269; 239 at 658–659; Gov't Ex. 173). Perkins offered the agent card data as payment. (Doc. 237 at 156, 168–171, 175–177).

Eventually, the agent and Perkins met at a Ruby Tuesdays restaurant in Atlanta. (Doc. 237 at 118–119, 181–189). The FBI videotaped and recorded the meeting. (Doc. 237 at 182–192; Gov't Exs. 10, 11). During the meeting, Perkins

handed 12 fraudulent credit cards to the undercover agent. (*Id.*; Gov't Ex. 12). When they left the restaurant, Perkins was arrested. (Doc. 237 at 118-119, 196).

On arrest, Perkins possessed two Georgia Driver's licenses, one in the name of Jean-Daniel Perkins, was in possession of false identification documents in the name Daniel J. Mathews. (Gov't Ex. 14; Doc. 237 at 225–226). He also had around $3,250 cash and 20 counterfeit credit cards in his pocket, some under the Mathews name, but none under the name Perkins. (Gov't Exs. 16–19, 19.1; Doc. 237 at 227–229). Perkins possessed a USB thumb drive and a computer, which contained data relating to the 12 credit cards Perkins gave the undercover agent. (Gov't Exs. 21, 22; Doc. 237 at 230). At the time of his arrest, Perkins had a computer file over 13,000 pages long, containing at least 100,000 card account profiles. (PSR, ¶¶ 20(c), 60). Perkins arrived at the Atlanta Ruby Tuesdays in a black Cadillac Escalade that he drove, but it was registered in someone else's name. (Docs. 237 at 182, 211, 233–234; 239-598, 631–632; Gov't Ex. 24).

### D. Perkins rents apartment 1212 using a stolen identity, and keeps it full of evidence of credit card fraud.

After obtaining a search warrant, the FBI searched Gables apartment #1212, 820 West Marietta Street, in Atlanta. (Docs. 109-1; 237-237–238; Gov't Ex. 30–55). In the kitchen, agents found a computer hooked up to a MSR206 card writer through a serial-to-USB connection. (Doc. 237 at 239-245). Also connected to that computer was a USB thumb drive, which computer forensics later showed contained information for the 12 fraudulent cards Perkins gave to the undercover agent. (Doc. 238 at 312; Gov't Ex. 128).

The apartment contained camera equipment corresponding to the equipment Perkins told the undercover agent he purchased using fraudulent cards, and which matched the credit card receipts found on Perkins. (Doc. 237 at 244, 267–269; Gov't Ex. 93). Drawers in the apartment contained stacks of fraudulent credit cards, around 400 of them, and there were blank cards as well. (Doc. 237 at 244– 248, 259–261; Gov't Exs. 71–83). There was an uncashed $72,000 check from Suntrust, not made out to Perkins, and screenshots from Suntrust's internal computer system, including one for Ferry, Hayes, and Allen. (Doc. 237 at 261–262, 270–272; Gov't Exs. 85, 98–99). There were also checks from Cooper & Cooper. (Doc. 237 at 272–273; Gov't Exs. 101, 102). There were letters from American Express regarding merchant accounts, one regarding a disputed $165,000 charge. (Doc. 237 at 269–270; Gov't Exs. 96, 97).

The apartment contained an identification-card writer, which can create driver's licenses, as well as failed prints of Ohio Driver's licenses. (Doc. 237 at 247– 248, 257–260; Gov't Exs. 69, 70, 81). It also had credit card swipers that merchants use, and wire receipts showing transfers to Ukraine in the same names as was on the Internet chats on Perkins's computer when he was arrested. (Doc. 237 at 255– 256, 263–265; Gov't Exs. 65, 66, 90–92).  In addition, the evidence showed that Perkins leased the apartment using stolen identity information from Lisa Evans, who had never lived at that location.  (PSR ¶ 61.)

## 2. Procedural history

### A. The Trial

The Friday before trial, the district court held a pretrial conference. (Docs. 157, 253). After spouting pages-worth of sovereign-citizen jargon, Perkins became

6

angry, and began talking over the court, making it impossible to speak in the courtroom. (Docs. 253 at 24–41; 313 at 7–11). The court met counsel in chambers to discuss how to proceed should Perkins continue his outbursts during trial and have to be removed. (Docs. 253 at 43–49; 313-11).

The morning of trial, Perkins refused to leave Marshal's lockup. (Docs. 236 at 2–4; 313 at 11–12). When the court sent a deputy marshal to see if Perkins would appear, Perkins told the deputy that they were "going to have to beat me," that he would "be kicking and screaming to go into the courtroom," and "if it's on, it's on." (Docs. 236 at 26-27; 313 at 12–13). Perkins stood with his back all the way against the wall, his voice level rose, getting increasingly excited. (Docs. 236 at 27; 313 at 13).

After consulting with defense counsel and prosecutors, and given Perkins's resistance, the judge, court reporter, defense counsel, and a prosecutor visited Perkins in lockup to explain to him his rights. (Docs. 236 at 3–20, 24–38; 313 at 13). When the court entered lockup, Perkins "immediately became violent, kicking so hard against the door that the deputy marshals became alarmed and opened the door to remove him." (Docs. 236 at 39; 313 at 13). The court ordered them not to. (*Id*.). While the judge explained his rights, Perkins talked over her the entire time. (Docs. 236 at 39–46; 313 at 14). The court explained that she wished Perkins would come to the courtroom, but otherwise he could watch the trial from lockup. (*Id*.). Perkins loudly repeated, "I don't understand. I don't agree" the entire time. (Docs. 236-39–46; 313-14–15).

The court returned to the courtroom, where the court repeated Perkins's rights while Perkins watched and listened to a live audio-video feed. (Docs. 236

at 46–48; 313-15). The judge let Perkins know she would ask counsel to visit him during the day to consult, and that Perkins would have a pen and notepad. (Doc. 236 at 47–48). Defense counsel voiced no objection to either the visit to lockup nor to these procedures. (Doc. 236). The next morning, after jury selection, Perkins still refused to attend, counsel said that he objected to the video feed and other procedures, but he made no suggestion other than wanting trial stopped. (Doc. 237 at 58–59).

During trial, the court asked defense counsel to visit Perkins during breaks, and otherwise consulted with counsel about the proper way to proceed. (Docs. 237 at 59, 67–68; 238-287–288, 394, 531; 239 at 535–536, 644–645, 727).  After a four-day trial, a jury convicted Perkins on all 37 counts. (Doc. 178). The district court, varying downward, sentenced Perkins to 360 months of imprisonment. (Docs. 311; 313).

### B. Perkins's jail calls before and during the trial showed that Perkins purposely refused to attend the trail as part of a calculated strategy to inject error and avoid punishment

On jail calls before and during trial, Perkins, his mother, and his brother discussed Rule 43 of the Federal Rules of Criminal Procedure, regarding a defendant's presence at trial. (Doc. 309(1) at 108–123). Perkins discovered that "trial cannot commence … without the presence of the defendant." (Docs. 309 at 22; 313 at 17). Perkins asked his family to research the legal terms "presence" and "absence," and together they discussed Rule 43 and various case law, including the Supreme Court's *Crosby* decision; Perkins even provided citations for them to review. (Docs. 309(1) at 108–123, 105–107; 313 at 17). Perkins explained that not

8

being present at the beginning of trial is "a major loophole." (Doc. 309(1)-120).

According to Perkins, what he needed to do the morning of trial was to act crazy:

> Oh, okay. I got it. I got to go straight plumb nuts before they even pick the jury. That's what I gotta do. I gotta go haywire on that bitch.
> ….
> Oh, okay. So I gotta be … plumb nuts before the shit even pop up. Don't never … don't never act sensible.
> …
> That's how you gotta do it. "Who said I want to go trial. I don't want to go to no mother fucking trial. I don't want no jury trial … How you gonna make me have a jury. …This shit ain't popping off, you mother fucking bitch…." And just go crazy on that mother fucker.
> ….
> Yeah. I need to get that down. Okay. You bitches want to play games. This shit going to get real zoo-like.

(Docs. 309(1) at 26–27; 313 at 17–18). Perkins recognized that once trial started the judge can remove him and that "presence is the most essential thing I see they need…." (Docs. 309(1) at 48; 313 at 19).

After the court visited Perkins in lockup, Perkins boasted to his family that he outsmarted everyone, including by claiming that he did not understand or agree:

> I went cold turkey on them bitches this morning. You hear me? …
> I didn't even go out there … [T]he judge kept sending people up there…trying to beg me to come down there and … talk on the record… I was like, no, fucker.
> …
> So, I kept on saying…and it was recorded and I kept saying it loud, talking over. I kept saying I do not understand. I don't agree. I do not understand. I do not understand.

(Docs. 309(1)-65–66; 313-20–22). Perkins said that he found the way to avoid punishment that could potentially prevent the justice system from working:

[M]a, I'm going to give you…I'm going to give you the game right now. I figured it out. You ever get a charge…don't go to court. Don't…Don't [unintelligible]. When they get you in the building, you not, you not going in that bitch.

…

[T]he book says that trial doesn't start until you…until…until you are in the court…until you…until you present. That's why I had you looking up all that shit (untelligible) for until you are present. And once you are present, right, you have to be present when the first juror is sworn in and go to…I never…you have to be in the court and cross the bar. I never…I'm not…that's my new thing. I ain't going to court. When I get out of this mother fucker, I ain't going to no court no more…I'm not even crossing the bar.

…

Yeah. I feel why this shit is so dangerous here, ma. I see why everybody ain't supposed to know this shit though.

…

I see why. I going to have more of a respect for it though, you know what I'm saying. Because that shit could fuck the whole … this shit could fuck the whole system up, man. This shit could go crazy, man.

(Docs 309(1)66, 77-78; 313-22).

After the verdict, just as he intended when he refused to attend trial, Perkins moved for a new trial claiming a violation of Rule 43, requiring his presence at the beginning of trial. (Doc. 190). In a 56-page order, the district court denied Perkins's motion, finding that trial commenced in lock-up, Perkins waived his presence, and that he invited any error. (Doc. 313).

### C. Sentencing

Perkins did not object to the facts in the PSR. (PSR, ¶¶ 19–70, 86–145). Perkins was arrested 19 times between the ages of 7 and 14. (PSR, ¶¶ 95–114; Doc. 326-45, 52, 59). His adult record includes possession of crack and another federal fraud

conviction, in total earning him a criminal history category of IV. (PSR, ¶¶ 87–90). The PSR recommended a Guidelines range of Life plus 24 months. (PSR-45).

As he did at trial, Perkins refused to appear for sentencing. (Doc. 326 at 2–8, 11-18). This time when the court tried to see him in lockup, he hid in the bathroom. (Doc. 326 at 4–6, 11–18). So the court broadcast sentencing to him through live audio-video. (Doc. 326 at 4–6, 18–20). Over objection, the court assessed Perkins a two-point enhancement under USSG §3C1.1 for attempting to obstruct justice. (Doc. 326 at 21, 36, 41–42). The district court upheld much of Perkins's objections as to loss, and calculated Perkins's Guidelines range as 360–life, plus a 24-month mandatory minimum consecutive sentence for aggravated identity theft. (Doc. 326 at 21–32, 41–44, 57–58). The court concurred with the government's recommendation to vary downward, imposing a total sentence of 360 months of imprisonment. (Doc. 326 at 22, 54, 58–62).

The district court explained that it would have imposed a 360-month sentence regardless of the Guidelines range: "So I will say when I ultimately sentence that wherever that Guideline is I would give the same sentence anyway." (Doc. 326 at 58). It also explained that it had never had a fraud case this extensive, and that it hadn't "seen anybody that has a less compliant attitude toward the law or less regret than Mr. Perkins." (Doc. 326 at 59). The court concluded that "society would be in grave danger with a sentence that wasn't sufficiently long." (Doc. 326 at 61).

**D. The Eleventh Circuit affirms, holding that Perkins purposely "embarked upon a new scheme" to "ensnarl the proceedings against him."**

Perkins raised the following claims on appeal: (1) the district erred by denying Perkins the right to counsel of his choice; (2) the district court erred by denying Perkins's motions to suppress evidence; (3) the district court erred by denying Perkins's pro se motion to recuse, and by failing to recuse sua sponte; (4) the district court erred by holding trial in Perkins's absence; (5) the district court violated Perkins's right to a public trial; (6) the evidence was insufficient to convict Perkins; (7) the district court erred by sentencing Perkins to 360 months of imprisonment; and (8) the district court erred by not ordering a competency hearing. (Doc. 345); *United States v. Perkins*, 787 F.3d 1329 (11th Cir. 2015). The Eleventh Circuit affirmed on June 1, 2015, finding that, as is relevant here, Perkins was competent to stand trial; the district court did not violate Perkins's right to a public trial; and the district court was not required to recuse. *Perkins*, 787 F.3d at 1338-42.

In holding that Perkins was competent to stand trial, the Court found that Perkins "planned and executed a strategy to stymie the district court proceedings by saying things that sounded crazy, much like he designed and executed the extensive fraud scheme that brought him before the district court." *Id.* At 1340. The court further held that the "[r]ecordings of Mr. Perkins's telephone calls with family members demonstrate that Mr. Perkins carefully studied the Federal Rules of Criminal Procedure and then developed tactics to avoid trial." *Id.* at 1340.

### E.     Perkins's Section 2255 Motion

Despite the Eleventh Circuit's rejection of Perkins's claims on direct appeal, he filed a motion pursuant to 28 U.S.C. § 2255 in which he attempted to relitigate his failed claims on direct appeal, including the issue of his competency.  (Doc. 359).  The Government filed a response brief asserting that Perkins was barred from relitigating the issues disposed of by the Eleventh Circuit on direct appeal and that his claims lacked merit.  (Doc. 366).  The Magistrate Court conducted an evidentiary hearing on February 18, 2020, which the Court limited to a single issue:  "[w]hether trial counsel provided ineffective assistance when they failed to request a mental health evaluation of Perkins prior to, during, or after trial and before sentencing."  (Doc. 398).  The hearing lasted late into the evening of February 18, and the Magistrate Court heard testimony from eight witnesses, including three treating physicians for Perkins, both of his trial-level attorneys, and experts for both the Government and Perkins.

### 1.  The Magistrate Court's Report and Recommendation

On April 13, 2020, the Magistrate Court issued a Report and Recommendation rejecting all of Perkins's Section 2255 claims.  (Doc. 420.)  As to the ineffective assistance claim, for which the Court heard evidence on February 18, the Court held that counsel could not have been ineffective for their failure to request a competency evaluation because both the District Court and the Eleventh Circuit found that Perkins's actions were a "common tactic 'obviously designed to disrupt and obstruct the federal proceeding.'"  (*Id.* at 28).  The Court went on to find that both of Perkins's trial counsel acted reasonably under the circumstances and had no reason to believe that Perkins was incompetent.  (*Id.* at 29).

The Magistrate Court further found that, in any event, Perkins failed to demonstrate he was incompetent at the time of trial and sentencing.  (*Id*. at 30).  The Magistrate Court found that the jail calls show that Perkins "developed a plan, weight various options in carrying out his plan, implemented his plan, and celebrated his success."  (*Id*.)  The Court also found that the opinion of Perkins's expert, Dr. Adriana Flores, was "entitled to little, if any, weight."  (*Id*. at 31).

### 2.  The Court's Order Adopting the Report and Recommendation

On November 30, 2020, this Court adopted the Magistrate Court's Report and Recommendation.  (Doc. 432).  The Court held that "[f]rom a review of the record it is clear that Movant, leading up to his trial, during trial, and afterward, attempted to fake being mentally incompetent in an effort to disrupt his criminal proceedings."  (*Id*. at 2).  The Court further agreed with the Magistrate Court that "it is clear that Judge Carnes would not have granted a [competency] hearing," which was fatal to Perkins's ability to demonstrate prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).  The Court held that Perkins "continues in his efforts to 'game' the system to his advantage, and it is not surprising that his expert witness found mental problems."  (*Id*. at 5-6).

### 3.  Perkins's Appeal of the Court's Section 2255 Order

In addition to the instant motion for compassionate release, Perkins is also appealing the Court's denial of his Section 2255 claims to the Eleventh Circuit. (Doc. 434.)  Most recently, Perkins's Section 2255 counsel filed a motion in the Eleventh Circuit to expand the scope of the Certificate of Appealability issued by this Court.  *Perkins v. United States*, Case No. 20-14781 (motion filed Apr. 5, 2021).

14

### 3. Government's response to the COVID-19 pandemic

The Department of Justice has taken many steps to protect the health and safety of federal inmates during this pandemic. The Bureau of Prisons ("BOP") has recently begun to vaccinate inmates against the coronavirus. As of today, the BOP has administered 110,988 doses of the vaccine to inmates and staff. *See* https://www.bop.gov/coronavirus (last visited Apr. 6, 2021).

Moreover, the BOP has used available authority to place certain inmates on home confinement. On March 26, 2020, the Attorney General directed the to "prioritize the use of [its] statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." Memorandum from the Attorney General, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), *available at* https://www.justice.gov/file/1262731/download. Inmates are more likely to be granted home confinement when the CDC risk factors indicate their greater vulnerability to COVID-19. *Id.* at 1-2. About one week later, the Attorney General issued a follow-on memorandum that instructed BOP to prioritize review of home confinement applications of inmates at institutions where there have been COVID-19 outbreaks. Memorandum from the Attorney General, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download.

BOP is devoting all available resources to implement this directive. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General for confinement. Additionally, while no request is necessary, any inmate who believes he or she is

eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager. *Id.* These and other efforts by BOP to combat the coronavirus, as well as up-to-date infection data, are detailed at the following webpage: https://www.bop.gov/coronavirus.

Moreover, BOP has taken significant measures to protect the health of the inmates in its charge, including the following:

a.  Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has limited the movement of inmates and detainees among its facilities. Prior to transfer, inmates are tested. If positive for COVID-19, they are not permitted to transfer; if negative, they are placed in quarantine for at least 14 days before transfer.

b.  All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.

c.  Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates who test negative are placed in quarantine. Symptomatic inmates or asymptomatic inmates who test positive are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

16

d.  Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. Volunteer visits, with the exception of visitation volunteers, are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

e.  Social visits were suspended between March 13, 2020 and October 2, 2020 to limit the number of people entering the facility and interacting with inmates. As of October 3, 2020, non-contact social visiting has resumed under restricted procedures designed to protect both inmates and visitors. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

*See* https://www.bop.gov/coronavirus/covid19_status.jsp (last updated Nov. 25, 2020).

## Discussion

Under 18 U.S.C. § 3582(c)(1)(A)(i), the district court "may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Pursuant to statutory authority, the Sentencing Commission issued a policy statement at § 1B1.13 to govern compassionate release. That statement requires additionally

that the court find "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Even if the defendant establishes "extraordinary and compelling reasons," § 3582 leaves it to the district court's discretion whether to reduce the sentence. The court must consider the § 3553(a) factors to determine if any reduction would be appropriate. *See, e.g.*, *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

On each point, the inmate bears the burden of proof. *See, e.g.*, *United States v. Rodriguez-Orejuela*, 457 F. Supp. 3d 1275, 1282 (S.D. Fla. Apr. 28, 2020) ("In seeking a reduced sentence under this framework, the defendant 'bears the burden of establishing that compassionate release is warranted.'").[1]

## 1. The Court should deny Perkins's motion because he has not established extraordinary and compelling reasons for a sentence reduction.

The mere existence of the COVID-19 pandemic "cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). District courts "cannot release every prisoner at risk of contracting COVID-19 because [they] would then be obligated to release every prisoner." *United States v. Wright*, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020). Instead, "courts have found extraordinary and compelling

---

[1] BOP has no record of receiving any request for compassionate release from Perkins.   Although the Government maintains that Perkins has failed to exhaust his administrative remedies, the Government responds here to Perkins's substantive claims that he is entitled to compassionate release based upon the Court's finding that "Defendant has shown adequate exhaustion efforts."   (Doc. 451.)

reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Feiling*, 453 F. Supp. 3d 832, 841 (E.D. Va. Apr. 10, 2020).

The burden is on the defendant to explain how his or her medical conditions lead to a heightened risk of contracting COVID-19 and falling seriously ill as a result. *See United States v. Eagan*, Case No. 1:18-cr-00282-MHC-JFK, Doc. 35, at *9 (N.D. Ga. June 22, 2020) (rejecting compassionate release for HIV-positive inmate who had only stated that he takes medication for his condition and failed to "describe the nature of his HIV (including the extent to which he is immunocompromised), whether he has a low CD4 cell count, and whether he receives antiretroviral therapy"). The mere fact that an inmate's "medical conditions theoretically exacerbate the likelihood of contracting COVID-19" is not enough: those conditions must have "deleterious effects . . . that currently make him more likely to contract COVID-19." *Id.* at *10; *see also, e.g.*, *United States v. Freeman*, CR 406-336, 2020 WL 2449345, at *1-2 (S.D. Ga. May 12, 2020) (finding no extraordinary and compelling circumstances where defendant had diabetes, asthma, high blood pressure and is on a C-PAP breathing machine but "provide[d] no medical evidence to support his alleged serious medical conditions or the impact that COVID-19 would have upon him individually": "generalized concern about possible exposure is at this point too speculative to qualify as extraordinary and compelling").

In an effort to meet his burden, Perkins argues that he has asthma, sleep apnea, and that he is overweight.  Yet only two of these conditions – asthma and

being overweight – are present on the CDC's list of medical conditions for which adults are "more likely to get severely ill from COVID-19."

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited April 6, 2020). But Perkins's medical records do not establish that these conditions, as particularized to him, present extraordinary and compelling reasons to immediately release him from prison.

As for asthma, this condition only creates an increased risk for becoming severely ill from COVID-19 when it is "moderate to severe." *Id.* Perkins's medical records mention in several places that Perkins has a history of "asthma, unspecified," but they do not suggest that Perkins has ever experienced any complications form asthma. (Med Rec. at 5, 6, 25, 27, 38.) In September of 2020, Perkins's records show that Perkins "does not appear acutely sob [short of breath]." (*Id.* at 5.) And, as recently as February 26, 2021, BOP clinicians noted that, despite his history of asthma and sleep apnea, Perkins's respiratory system was "Within Normal Limits." (Supp. Med. Rec., attached as Ex. A, at 3.)[2] Perkins is further prescribed an inhaler to treat the condition, and there is no suggestion in his records that the inhaler does not adequately control his asthma. (Med. Rec. at 5, 6, 36.).[3]

---

[2] The Government will file Perkins's Supplemental Medical Records under seal.

[3] Perkins was seen on February 26, 2021 based on his subjective request that he needed a CPAP machine for sleep apnea. (Supp. Med. Rec. at 3.) The treating physician disagreed that Perkins needed a CPAP machine and simply renewed Perkins's prescriptions for asthma inhalers to use as needed. (*Id.* at 6.)

Perkins's asthma is, therefore, well-managed and does not establish an extraordinary and compelling reason for release.  *See, e.g., United States v. Godofsky*, No. 5:16-59-KKC-1, 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (denying compassionate release for 63-year-old inmate with high blood pressure, high cholesterol, and asthma, taking medications that weaken his immune system, because these conditions did not establish extraordinary or compelling reasons "even in the context of the ongoing public health crisis"); *United States v. Cooper*, No. 2:14-CR-00228-JAD-CWH, 2020 WL 2064066, at *3 (D. Nev. Apr. 29, 2020) (denying compassionate release for 53-year-old defendant with asthma and chronic sleep apnea); *United States v. Ramos*, No. 14 Cr. 484 (LGS), 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (denying compassionate release to 41-year old defendant whose asthma was controlled and being treated by BOP).

Perkins also argues that his weight of 196 pounds and Body Mass Index ("BMI") of 28.94 as an extraordinary and compelling reason for release.  (Doc. 443 at 36-37.)  But, as with asthma, there is no indication in Perkins's records, that his weight presents any health issues for Perkins.   Indeed, Perkins's BMI falls under the threshold of 30 for obesity.  And even for slightly obese individuals - which Perkins is not -- courts have rejected compassionate release motions.  *See United States v. Golden*, Case No. 1:17-cr-00287-LMM-JFK, Doc. 357, at 7 (N.D. Ga. Aug. 26, 2020) (denying compassionate release to an inmate with "BMI of 31.9–33 [because] Defendant's weight is near the low end of the obesity threshold, which starts at 30"); *United States v. Lockley*, Case No. 1:17-cr-00127-MHC-JKL, Doc. 190 (N.D. Ga. Oct. 5, 2020) (finding no extraordinary and compelling reason for a 26-year-old African American man who presented with obesity and hypertension);

*United States v. Valdiviez*, Case No. 1:12-cr-00153-SDG-RGV, Doc. 183, at 4 (N.D. Ga. Dec. 1, 2020) (finding no extraordinary and compelling circumstances for a slightly obese inmate who also alleged being a heavy smoker and suffering from hypertension).

Perkins's medical conditions, taken alone or in combination, do not rise to the level of extraordinary and compelling reasons justifying his immediate release. Perkins is 46 years old, outside the age group that is particularly at risk for COVID-19. The BOP is effectively treating his medical conditions, which appear to be well-managed and under control. They present no impediment to self-care in prison. *See* U.S.S.G. § 1B1.13 cmt. n.1(A). Among the inmate population, Perkins does not fall into the group most at risk of severe illness from COVID-19. There are no limitations on Perkins's physical activity, nor are there any work restrictions imposed on Perkins due to his medical conditions.  (Supp. Med. Rec. at 70-71.)  He has failed to establish extraordinary and compelling reasons for his release, and his motion should be denied.

## 2.  The Court should also deny the motion because Perkins has failed to prove that his release would pose no danger to the community.

To qualify for compassionate release, the inmate must prove that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Not only has Perkins failed to meet his burden, his offense conduct and criminal history shows that releasing him would pose a danger to the community.

As the Court noted at sentencing, it had "never had [a fraud case] quite this extensive."  (Doc. 326 at 59.)  Judge Carnes further stated, "I think society would

be in grave danger with a sentence that wasn't sufficiently long from the fraud aspect."  (*Id.* at 61.)  She further found that Perkins was "too old to change" and that there was little reason to believe that "any treatment we could prescribe . . . would change the way Mr. Perkins is."  (*Id.*)

The Court's findings in this regard were well-supported by the record and remain true today.  In addition to his extensive criminal history and pattern of victimizing others, Perkins has demonstrated an utter lack of remorse and continues his long history of fraud on the court through his attempts to undermine the legal process.  As this Court recently stated in the context of Perkins's Section 2255 motion, Perkins "continues in his efforts to 'game' the system to his advantage."  (Doc. 432 at 5-6.)

This pattern of repeated criminal activity supports finding that Perkins's release would endanger the safety of the community. A defendant may pose a danger to the community not only through "physical violence" but also if he "might engage in criminal activity to the detriment of the community." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (quoting legislative history of the Bail Reform Act for proposition that "dangerousness" and "safety" are broad terms that contemplate criminal activity beyond "physical violence"); *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."). In the past, Perkins's encounters with the criminal justice system, including a prior federal conviction, have not deterred him from engaging in additional criminal conduct or in his continued attempts to manipulate the legal system. That past shows the future risk that would result from shortening his sentence.

23

### 3. The 3553(a) factors do not support reducing Perkins's sentence.

The § 3553(a) factors also do not support immediate release, which would cut more than 15 years off Perkins's prison sentence, currently set to end in July 2036. Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment," "to afford adequate deterrence to criminal conduct," and "to protect the public." 18 U.S.C. § 3553(a).

The nature and circumstances of Perkins's offenses are serious. He was the mastermind of numerous fraud schemes resulting in actual and intended losses of over $73 million. (PSR ¶ 75.) Indeed, as noted in the Government's response to the PSR, the loss amount attributed to Perkins actually understated the intended loss amount in the case and was a conservative estimate. (*Id*.)  Perkins was the leader of the conspiracies and recruited the other defendants and directed their activities. (PSR ¶ 21.) He obtained stolen credit card information from international brokers in the Ukraine and created counterfeit credit cards using a MSR206 card writer. (Docs 237 at 172-174; 239 at 706, 709–724).  In total Perkins victimized thousands of individuals, including nearly two thousand in the American Express scheme alone. (PSR ¶ 76.)

The court's imposition of a 360-month sentence – which constituted a downward variance – recognized the seriousness of Perkins's offenses and the impact that those offenses had on his victims. Bank fraud and identity theft causes significant harm to its victims, who must deal both with the immediate effects of their good names and credit being used for criminal purposes, but also

with the uncertainty of not knowing who all may still have their identity information in the criminal world or how it will be used in the future. Victims often suffer psychological effects, including the loss of trust, that accompany a crime that invades one's privacy like identity theft. Perkins's crime was not a one-time affair. He victimized numerous people over time, damaging both individuals and companies.  The sentencing Court was correct when it stated that "society would be in grave danger with a sentence that wasn't sufficiently long" for Perkins. (Doc. 326 at 61.)

Perkins's history and characteristics, as well as the need for deterrence and to promote respect for the law, further weigh against reducing his sentence. Perkins has embarked on a campaign – which he began during his trial and sentencing and has continued with his Section 2255 motion – to disrupt the legal system and to reverse his convictions based upon error he manufactured himself. On numerous occasions, the Magistrate Court, this Court, and the Eleventh Circuit have found that Perkins engaged in a studied, contrived, and manipulative attempt to disrupt court proceedings and avoid trial. (Doc. 253 at 36-37 ("This is definitely studied definitely contrived, definitely manipulative"); *Perkins*, 787 F.3d at 1340 ("Mr. Perkins carefully studied the Federal Rules of Criminal Procedure and then developed tactics to avoid trial."; Doc. 420 at 30 ("Movant developed a plan, weighed various options in carrying out his plan, implemented his plan, and celebrated his success."); Doc. 432 ("Movant continues in his efforts to 'game' the system to his advantage.").[4]

---

[4] Perkins's references a diagnosis of schizophrenia in his motion (Doc. 443 at 6.)  But Perkins fails to acknowledge that this diagnosis was removed after

In short, if released, Perkins is highly likely to engage in further criminal conduct, as he has in the past.  His actions in seeking to undermine the judicial process and to waste court resources on manufactured claims demonstrate that he has no remorse for his crimes, that he would be likely to engage in further criminal activity, and that he lacks any respect for the law.

## Conclusion

The United States respectfully requests that the Court deny Perkins's motion for compassionate release. However, if the Court intends to grant the motion, the government requests a 14-day quarantine period and medical clearance prior to release to minimize the potential to spread COVID-19 to the public.

Respectfully submitted,

KURT R. ERSKINE
*Acting United States Attorney*


/s/ David A. O'Neal
DAVID A. O'NEAL
*Assistant United States Attorney*
Georgia Bar No.

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
(404) 581-6000; fax (404) 581-6181

April 6, 2021

---

Perkins's treating psychologist concluded that Perkins's pattern of self-reporting symptoms appeared to be goal-oriented, meaning that symptoms were reported in close proximity to when Perkins wanted something.   (Doc. 420 at 20.)

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

I certify that this document was prepared using Book Antiqua 13-point font, and that I have caused a copy of the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system. Additionally, a copy of this document has been mailed to the following address:

This 6th of April, 2021.

/s/ David A. O'Neal
DAVID A. O'NEAL
*Assistant United States Attorney*